TEXAS EMPLOYERS' INSURANCE ASSOCIATION, Appellant,

v.

Bobby G. SCHAEFER, Appellee.

No. 5409.

Court of Civil Appeals of Texas, Eastland.

April 24, 1980.

Rehearing Denied May 22, 1980.

David J. Dunn, James W. Wray, Jr., Dyer & Redford, Corpus Christi, for appellant.

David L. Perry, Russell H. McMains, Edwards & Perry, Corpus Christi, for appellee.

McCLOUD, Chief Justice.

Plaintiff, Bobby G. Schaefer, sued defendant, Texas Employers' Insurance Association, seeking recovery for an occupational disease. The jury found that the "atypical tuberculosis" which plaintiff has is an occupational disease, and that he suffered total and permanent disability. Defendant appeals. We reverse and render.

Plaintiff has a rare disease known as mycobacteriosis intracellular which is sometimes referred to as atypical tuberculosis. The disease is caused by mycobacteria intracellularis (hereafter called m. intracellularis). The medical authorities are uncertain as to how the bacteria enter the body. The bacteria have been found in soil, house dust, pasteurized dairy products, tap water, and seawater. Plaintiff, a plumber, worked frequently in soil contaminated with human feces, and he on occasion went under houses "where there had been different kinds of fowls, birds, sheep and goats." There is no evidence of any studies showing that m. intracellularis has ever been found in Nueces County. There is no proof that m. intracellularis had ever been isolated in the soil, fowl or animal droppings, or human waste in places where the plaintiff worked.

The issues in this case turn on our interpretation of Tex.Rev.Civ.Stat.Ann. art. 8306, § 20 (Vernon Supp.1980) which provides:

Wherever the terms "Injury" or "Personal Injury" are used in the Workmen's Compensation Laws of this State, such terms shall be construed to mean damage or harm to the physical structure of the body and such diseases or infections as naturally result therefrom. The terms "Injury" and "Personal Injury" shall also be construed to mean and include "Occupational Diseases," hereinafter defined. Whenever the term "Occupational Disease" is used in the Workmen's Compensation Laws of this State, such term shall be construed to mean any disease arising out of and in the course of employment which causes damage or harm to the physical structure of the body and such other diseases or infections as naturally result therefrom. An "Occupational Disease" shall also include damage or harm to the physical structure of the body occurring as the result of repetitious physical traumatic activities extending over a period of time and arising in the course of employment; provided, that the date of the cumulative injury shall be the date disability was caused thereby. Ordinary diseases of life to which the general public is exposed outside of the employment shall not be compensable, except where such diseases follow as an incident to an "Occupational Disease" or "Injury" as defined in this section.

See *Transportation Insurance Company v. Maksyn*, 580 S.W.2d 334 (Tex.1979).

By points 1 and 2, defendant urges that the evidence is legally insufficient to establish that plaintiff was exposed to or contracted the disease while in the course and scope of his employment. We agree.

The court in *Parker v. Employers Mutual Liability Insurance Company of Wisconsin*, 440 S.W.2d 43 (Tex.1969), stated:

(T)he employer is responsible for a disease or injury, whether at fault or not, if

the employment occasioned it. Our notions of justice and social policy have long required that there be this causal connection to assess liability for harm. The sine qua non test must be met: but for the conduct or condition, in this case the employment, would the plaintiff have suffered the harm?

The court also announced the test used to determine whether a plaintiff has presented sufficient evidence of probative force to go to the jury as follows:

First, courts have allowed juries to decide causation where the general experience or common sense dictate that reasonable men know, or can anticipate, that an event is generally followed by another event.

\*    \*    \*    \*    \*    \*

Secondly, courts present the jury with causation questions when there is a scientific generalization, a sharp categorical law, which theorizes that a result is always directly traceable back to a cause. Where, in other words, the harmful consequences provide a traceable chain of causation back to the act itself. This is the traditional use courts have made of expert testimony.

\*    \*    \*    \*    \*    \*

Thirdly, probabilities of causation articulated by scientific experts have been deemed sufficient to allow a plaintiff to proceed to the jury. For while a scientific training conceives of anything as possible, coincidence can be measured and generalizations similar to but not the same as uniform physical laws can be drawn from the probability of a result following a cause. In fact, the relationship between cause and its effect per se without theoretical explanation, can be nothing more than probable relationships between particulars. But this probability must, in equity and justice, be more than coincidence before there can be deemed sufficient proof for the plaintiff to go to the jury.

\*    \*    \*    \*    \*    \*

There can be many possible "causes," indeed, an infinite number of circumstances can cause an injury. But a possible cause only becomes "probable" when in the absence of other reasonable causal explanations it becomes more likely than not that the injury was a result of its action. This is the outer limit of inference upon which an issue can be submitted to the jury.

The case at bar falls within the third method of proof articulated above.

■  Considering the obscure etiology of this disease, it is difficult for plaintiff to prove that the disease arose out of or in the course of his employment. But as stated in *Parker*:

(T)he fact that a determination of causation is difficult cannot provide a plaintiff with an excuse to dispense with the introduction of some evidence proving causation.

Plaintiff relies on the testimony of Dr. Anderson who stated:

Q.  (A)ssume the term occupational disease means a disease which arises out of and in the course of employment which causes damage or harm to the physical structure of the body and I'll ask you whether or not you have an opinion based on reasonable medical probability as to whether the atypical tuberculosis from which Mr. Schaefer is suffering, as it applies in his case, whether it is an occupational disease within that definition?

A.  Yes, sir. I think it is.

■  In evaluating this testimony, we are guided by the rule stated in *Insurance Company of North America v. Myers*, 411 S.W.2d 710 (Tex.1966).

Causal connection in such a fact situation must rest in reasonable probabilities; otherwise, the inference that such actually did occur can be no more than speculation and conjecture. *Whitten v. Liberty Mutual Ins. Co.*, 257 F.2d 699 (5th Cir. 1958). Reasonable probability, in turn, is determinable by consideration of the sub-

stance of the testimony of the expert witness and does not turn on semantics or on the use by the witness of any particular term or phrase.

It is not enough for the expert to express an opinion as being based on reasonable medical probability when his own testimony, in substance, reveals that it is based on mere possibilities and conjecture.

It is clear that Dr. Anderson based his opinion on his belief that plaintiff, as a plumber, had a greater opportunity for exposure to m. intracellularis than the average individual. Dr. Anderson testified:

Q. The question was whether this kind of exposure that I related to you, that kind of work in your opinion would increase his exposure to the organisms which produce the disease that he has?

A. Yes, sir. I think it does and one of the things I should have said before and it's in Dr. Chapman's book is they've isolated a lot of organisms from people and to me it seems perfectly plausible, anybody exposed to that type of soil, contaminated soil, repeatedly crawling under houses and the kind of work this man was doing repeatedly, he had a perfectly beautiful opportunity to acquire and reinoculate himself with these organisms.

Dr. Anderson testified further that, although m. intracellularis is divided into numerous serotypes, or subtypes, he has not determined which type plaintiff has. This is significant in that some of these subtypes are pathogenic to birds, and bird droppings are one of the means by which the disease can be transmitted to human beings. Without knowing whether plaintiff has an avian strain, the conclusion that he "could" have been exposed to the bacteria while working in soil contaminated by bird and fowl droppings becomes at most a possibility or conjecture.

More importantly, there is no evidence that m. intracellularis is present in the soil in Nueces County; there certainly is no evidence that the bacteria was present in the soil where plaintiff worked.

The substance of Dr. Anderson's testimony is that farmers and others in "dirty" occupations tend to have a greater exposure to the bacteria; that plaintiff worked in areas of contaminated soil; that plaintiff has contracted one of the serotypes of m. intracellularis; and that, therefore, he has an "occupational disease." Dr. Anderson also testified that there are three ways the disease can enter the body, but he could not determine the method of entry in plaintiff's case. He bases plaintiff's opportunity for greater exposure on plaintiff's work in soil contaminated by bird droppings and fecal material, even though he states that he does not know whether plaintiff is suffering from an avian strain of the disease and even though there is no scientific study which suggests that the bacteria is ever, much less generally, found in sewage. Dr. Anderson testified:

Q. And if you were to make a test in some place where he worked and you found some sort of general undifferentiated mycobacterium intracellular, you still wouldn't know whether that's what caused his disease unless it was serotyped?

A. That's correct.

Q. In other words, in order to show that this man got this germ on the job you would have to find the serotype of the intracellularis in a place he had worked and you would have to identify that as the specific serotype that has caused his disease?

A. Sir, that's my understanding of serotyping; it's a more specific test.

In reviewing Dr. Anderson's evidence as a whole, not relying solely on his use of any particular term or phrase, it is evident that he did no more than suggest a possibility as to how or when plaintiff was exposed to or contracted the disease. Dr. Anderson's testimony that plaintiff's atypical tuberculosis

is an occupational disease is no more than conjecture or surmise. *Parker v. Employers Mutual Liability Insurance Company of Wisconsin*, supra; *Insurance Company of North America v. Myers*, supra. We sustain defendant's points 1 and 2.

Defendant also urges that there is no evidence of probative force to sustain plaintiff's recovery on the theory of repetitious physical traumatic activities. We agree. There is medical testimony that any form of exertion, including the manual labor involved in plumbing, will accelerate or aggravate the disease once it becomes active.

Tex.Rev.Civ.Stat.Ann. art. 8306, § 20 (Vernon Supp.1980) provides in relevant part:

An "Occupational Disease" shall also include damage or harm to the physical structure of the body occurring as the result of repetitious physical traumatic activities extending over a period of time and arising in the course of employment; provided, that the date of the cumulative injury shall be the date disability was caused thereby. Ordinary diseases of life to which the general public is exposed outside of the employment shall not be compensable, except where such diseases follow as an incident to an "Occupational Disease" or "Injury" as defined in this section.

In *Muller v. Charter Oak Fire Insurance Company*, 533 S.W.2d 123 (Tex.Civ.App.—Tyler 1976, writ ref'd n. r. e.), the court explained the applicable law as follows:

The last sentence of this section excludes from compensability those ordinary diseases of life to which the general public is exposed outside of the employment, unless such diseases follow as an incident to an occupational disease. This indicates a Legislative intent to require evidence of probative force of a causal connection between employment and occupational diseases. One scholar defines compensable occupational disease as those diseases which are indigenous to the claimant's work or present in an increased degree in

that work as compared with employment generally. See Larson, The Law of Workmen's Compensation, sec. 41.00.

1B Larson, The Law of Workmen's Compensation, Sec. 41.32 states:

The common element running through all is that of the distinctive relation of the particular disease to the nature of the employment, as contrasted with disease which might just as readily be contracted in other occupations or in every day life apart from employment.

Since we have held there is no evidence that plaintiff's disease arose out of the scope and course of his employment, we hold that mycobacteriosis intracellulare is, in this case, an "ordinary disease of life to which the general public is exposed outside of the employment." There is no evidence that the disease is "indigenous to the claimant's work or present in an increased degree in that work as compared with employment generally," nor is there evidence that plaintiff's disease resulted from "repetitious physical traumatic activities extending over a period of time and arising in the course of employment" or followed "as an incident to an 'Occupational Disease' or 'Injury.'" To hold otherwise would convert worker's compensation into health insurance. *Southern Casualty Co. v. Flores*, 1 S.W.2d 260 (Tex. Com.App.1928, judgment adopted); *Bewley v. Texas Employers Insurance Association*, 568 S.W.2d 208 (Tex.Civ.App.—Waco 1978, writ ref'd n. r. e.).

■ Plaintiff relies on *Teague v. Charter Oak Fire Insurance Co.*, 548 S.W.2d 957 (Tex.Civ.App.—Austin 1977, writ ref'd n. r. e.) and argues that the aggravation, acceleration, or excitement of a non-occupational disease is compensable. We disagree because, as we read the statute, an "ordinary disease of life" is one which does not arise out of the employment, but is one to which the general public is exposed. See *Mills v. Detroit Tuberculosis Sanitarium*, 323 Mich. 200, 35 N.W.2d 239 (1948). "Ordinary diseases of life," therefore, are only compensa-

ble when incident to an occupational disease or injury. See 1B Larson, The Law of Workmen's Compensation, sec. 41.32; Sartwelle, "Worker's Compensation," 32 Southwestern Law Journal 291, 350 (1978).

The judgment of the trial court is reversed, and judgment is here rendered that plaintiff take nothing.