611 P.2d 122

Paul J. KOSIK, Petitioner,

v.

The INDUSTRIAL COMMISSION OF ARIZONA, Respondent,

City of Tucson, Respondent Employer,

State Compensation Fund, Respondent Carrier.

No. 1 CA–IC 2181.

Court of Appeals of Arizona, Division 1, Department C.

May 8, 1980.

Rabinovitz, Dix & Sands, P. C. by Charles G. Rehling, II, Fred R. Sands, Tucson, for petitioner.

Calvin Harris, Chief Counsel, The Industrial Commission of Arizona, Phoenix, for respondent.

Robert K. Park, Chief Counsel, State Compensation Fund, Phoenix by George B. Morse, Tucson, for respondents employer & carrier.

OPINION

CONTRERAS, Presiding Judge, Department C.

This special action seeks to set aside the Industrial Commission's award determining that petitioner's claim was non-compensable. Petitioner asserts that the award cannot reasonably be supported by the law and the evidence. Additionally, it is asserted that the award should be set aside because petitioner, in violation of due process, was denied a fair and impartial hearing before the Industrial Commission. This latter assertion is predicated upon an alleged bias and prejudice of the hearing officer direct-

ed toward petitioner together with the hearing officer's assumption of an advocate's role at the hearing. After carefully and thoroughly reviewing the record, we are of the opinion that the award must be set aside because petitioner was not afforded the fair and impartial hearing to which he was entitled.

The claim for workmen's compensation benefits was filed by petitioner on May 26, 1978, for an industrial injury that allegedly occurred on May 12, 1978, while petitioner was working for his employer, the City of Tucson. By a Notice of Claim Status issued by the carrier on June 12, 1978, the claim was denied. After conducting a formal hearing, the hearing officer entered a Decision Upon Hearing and Findings and Award for Non-Compensable Claim in which it was determined that petitioner did not sustain an injury by accident arising out of and in the course of his employment. After the award was affirmed, this special action was filed.

At the time of the alleged industrial incident, petitioner was employed by the City of Tucson as a sign and equipment painter. On May 12, 1978, he was engaged in painting light poles with a co-worker, Daniel Leon. Petitioner painted poles while standing in a hard plastic bucket attached to a long boom that was part of a mobile aerial unit. The boom arm was operated by co-worker Leon. Petitioner testified that he had been painting a light pole while in the bucket and after asking Leon to move the bucket closer to the pole, there was an exchange of words and Leon pulled the control on the boom, causing the bucket to slam into the light pole, thereby throwing petitioner about its interior, injuring his knee and causing pain in his shoulder. Following this incident, petitioner testified that he and Leon had a further argument and he asked Leon to drive him back to the city's paint shop. Petitioner testified that at this point his knee had become swollen and was very painful. On returning to the shop, petitioner described the incident to Mr. Verkest, a shop foreman, and to Humberto Soto, petitioner's supervisor. Petitioner testified that he asked Mr. Soto to arrange his transportation to a doctor, but his request was denied. This failure to provide petitioner with transportation to the doctor was confirmed by Mr. Verkest who was present at the conversation between petitioner and Mr. Soto. Petitioner then proceeded on his own to see his doctor.

Testimony at the hearing revealed that there was a great deal of personal animosity between petitioner and his co-worker Leon. Leon denied "slamming" the bucket into a light pole. Leon testified that following petitioner's request to move the boom, he and petitioner had a heated argument over the manner in which the boom should be moved and after calling each other names, he moved the boom, brought petitioner down, and the argument continued. Leon further testified he then drove petitioner back to the paint shop and that petitioner made no complaint of a knee injury. Both Leon and petitioner's supervisor, Mr. Soto, thought that because the boom moved so slowly, injury to petitioner seemed unlikely.

At the hearing, medical testimony was taken from three doctors who, at one time or another, had treated petitioner. Dr. Kenneth Johnson first saw petitioner in November of 1977 regarding complaints of pain and swelling in the right knee. Dr. Johnson thought these complaints were due to a cartilage injury, and since surgery was indicated, he referred petitioner to Dr. Warren Eddy, an orthopedic surgeon. Dr. Eddy first examined petitioner on November 22, 1977, and concluded that petitioner suffered from a torn medial meniscus and he performed a medial meniscectomy upon petitioner's right knee on December 1, 1977. Because of continued pain, Dr. Eddy operated on petitioner a second time, looking for a possible neuroma in the area of the first operation's scar. On March 18, 1978, Dr. Eddy released petitioner for return to work on March 20, with a restriction against climbing.

On May 12, 1978, the day of the alleged industrial incident, petitioner went to Dr. Eddy complaining of swelling and pain in

his right knee. Dr. Eddy testified that petitioner told him that he had injured his knee while painting from a high rise truck and the operator moved the lift, causing him to strike his knee against the wall of the lift. Upon examining the right knee, Dr. Eddy found swelling and pain but no areas of localized tenderness. Dr. Eddy again saw petitioner on May 15 and noted complaints of pain, observed mild swelling and recommended that petitioner stay off work for a week. On May 22, Dr. Eddy again saw petitioner and noted an indescribable limp, complaints of pain, along with depression and bitter complaints about his work situation.

Based upon the history given to him by petitioner, Dr. Eddy testified that to a reasonable medical probability it was his opinion that the industrial incident caused petitioner's condition as observed by him during the May 12 examination. Upon cross examination when presented with the fact that petitioner walks 24 stair steps at least once or twice a day, Dr. Eddy declined to give an opinion within a reasonable medical probability that the stair climbing activity created the swelling and pain observed on May 12, although he did state that this activity could contribute to the condition. Dr. Eddy last saw petitioner on July 14, 1978. On that date, he observed continued synovitis and irritation in the right knee. When asked from what these problems stemmed, Dr. Eddy responded that the May 12 incident aggravated petitioner's preexisting knee problem and that the May 12 incident flared up petitioner's chronic condition of inflammation of the knee joint.

The basis for the hearing officer's denial of petitioner's claim was that insufficient evidence was presented to prove the industrial incident's occurrence or its causal connection to the symptomatology exhibited the day of the alleged incident.

Regarding the issue of whether the incident actually occurred, the hearing officer was presented with conflicting statements of petitioner and his co-worker, Leon. The rejection of petitioner's version was based upon what the hearing officer believed to be a lack of credibility. The hearing officer, in his Findings and Award, states that the petitioner testified that he had never sustained a knee injury prior to the May 12 incident, but the applicant "finally admitted that he really had knee problems before May 12, 1978" which necessitated a medial meniscectomy in December of 1977.

A review of the transcript of the hearing discloses, however, that at no time did petitioner testify that he had never sustained a knee injury prior to the May 12 incident. In fact, at the commencement of the hearing, petitioner's attorney attempted to bring out the history of petitioner's knee surgery prior to the May 12 incident. However, he was abruptly stopped by the hearing officer who stated he only wanted evidence concerning the May 12 injury. Subsequently, the hearing officer, after having previously curtailed petitioner's attorney, questioned petitioner extensively and developed the history of petitioner's previous knee problems which resulted in knee surgery in 1977. It is an anomaly to discredit petitioner based upon information elicited by the hearing officer when he previously denied petitioner's attorney the opportunity to present that very information.

The Findings and Award also state that petitioner became quite confusing in his testimony relating to his work experience following the injury. After reviewing the transcript, we are of the opinion that such a finding by the hearing officer is totally unwarranted. In this regard, the record clearly discloses that petitioner obviously has difficulty with the English language. The questioning of petitioner with respect to the subject of work experience following the injury was conducted almost exclusively by the hearing officer. We also note that the form of questions by the hearing officer in questioning petitioner on this particular subject substantially contributed to the confusion.

It is also clear from the record that the hearing officer interjected himself into the hearing to such an extent that he conducted a very substantial portion of the questioning of petitioner and the witnesses. In this

regard, petitioner levels the criticism that "the Hearing Officer asked nearly half of the questions throughout the entire hearing. . . ." Although we have not made an actual itemized count of the number of such questions, we observe from the transcript that petitioner's assertion is fairly accurate. Additionally, we conclude that the form and manner of questioning by the hearing officer was confusing, often misleading, and at times approximated adversarial cross examination.

Although a hearing officer is clearly entitled to ask questions of witnesses, it would certainly appear, at least from this transcript, that this should be done in a more sparing manner in order to avoid the appearance of impropriety and assertions of bias. Nor does it appear that this is a case where such intrusion by the hearing officer was at all necessary since both petitioner and respondents were represented by able counsel who were capable of presenting and developing the positions of their respective clients. Realistically, when an attorney finds himself caught up in a situation where a hearing officer (or a judge, for that matter) has taken over the questioning of witnesses, he is reluctant to voice objections for fear that by so doing he might incur the personal animosity of the hearing officer, thereby jeopardizing his client's position and resulting in a decision based on personalities rather than on the merits.

*Evertsen v. Industrial Commission*, 117 Ariz. 378, 573 P.2d 69 (App.1977), discusses the impartial character which the Industrial Commission and its hearing officers must maintain in order to comport with the requirements of due process to the end that all parties appearing before the Commission will receive a fair and impartial hearing. In discussing what is "fair and impartial", this court stated:

> What is "fair and impartial", like beauty, is mainly in the eyes of the beholder. Thus, if an adjudicatory tribunal "appears" to be favoring one side or the other regardless of the justness of its decision, the losing party is going to assume that the decision is biased. The

result is that not only is the decisional process of the tribunal brought into disrepute, the reviews of that tribunal naturally increase, burdening the entire system. In short, like Caesar's wife, an adjudicating tribunal must avoid even the appearance of impropriety in dealing with adverse interests appearing before it. This is no less true of the Industrial Commission as an executive body than it is of a superior court as a judicial body.

117 Ariz. at 383, 573 P.2d at 74.

After carefully reviewing the record, it is our opinion that in this case decisional objectivity is suspect because of the hearing officer's extensive participation in the hearing and the often adversarial nature of his questioning. We conclude that by reason of such conduct, petitioner was not afforded the fair and impartial hearing to which he was entitled. Therefore, the award must be set aside.

HAIRE and JACOBSON, JJ., concur.