703 P.2d 537

Edward F. FORD, Petitioner Employee,

v.

The INDUSTRIAL COMMISSION OF ARIZONA, Respondent,

Phelps Dodge Corporation, New Cornelia Branch, Respondent Employer,

·State Compensation Fund, Respondent Carrier.

No. 1 CA–IC 3042.

Court of Appeals of Arizona, Division 1, Department D.

April 19, 1984.

Hocker & Axford, P.C. by R. Kelly Hocker, Tempe, for petitioner employee.

Sandra A. Day, Legal Counsel, Indus. Com'n of Arizona, Phoenix, for respondent.

Evans, Kitchel & Jenckes, P.C. by Julie A. Doherty, Phoenix, for respondent employer and respondent carrier.

OGG, Judge.

This is a special action review of an April 26, 1983 Industrial Commission award for a noncompensable claim. For the reasons set forth below, we affirm the administrative law judge's (ALJ's) award.

Claimant, Edward F. Ford, was employed by respondent, Phelps Dodge Corporation, at the New Cornelia mine in Ajo, Arizona from May, 1959 to March, 1981. During these years he worked primarily in the crushing operations as a cleanup operator, car operator, screen operator, short heads operator, standard crusher operator and primary crusher operator. Claimant testified that during the twenty-one-plus years he worked at the Ajo mine, he was constantly exposed to heavy concentrations of dust and other irritants. Although he was provided with a respirator, claimant testified that the gas flow filtered respirator provided only "some help" against the dust and irritants. Claimant maintains that he began experiencing a dry, hacking cough and mucous congestion in 1969. Claimant ceased working for Phelps Dodge in March, 1981 and subsequently filed a claim for workmen's compensation benefits, claiming that his chronic coughing, mucous congestion and pulmonary condition were attributable to his twenty-one-plus years of employment with Phelps Dodge.

Three hearings were held concerning the claim. A total of three medical doctors testified. Dr. John Blaisdell testified that he had examined claimant in 1979, at which time claimant stated that he had developed a dry, hacking cough and a fever a week prior. Dr. Blaisdell diagnosed the condition as an acute viral, bacterial or fungal infection and prescribed antibiotics. Dr. Blaisdell could not relate claimant's symptoms to his employment and was unable to diagnose the cause of claimant's cough.

Dr. Arnold Serbin testified that he had examined claimant on several occasions, beginning in May, 1981. Based upon the examinations, claimant's history and claimant's other medical records and test results, Dr. Serbin opined that claimant's work environment either caused or contributed to his "cough situation". However, Dr. Serbin was unable to testify to a reasonable degree of medical probability that claimant's cough was *caused* by his employment with Phelps Dodge.

Dr. Allen Lipschultz testified on behalf of claimant. Dr. Lipschultz had examined claimant twice and based upon the examinations, claimant's past history and claimant's medical records and test results, he concluded, to a reasonable degree of medical probability, that claimant's occupational exposure was "very probably" the "significant catalyst" to producing claimant's "continuing irritative cough." At the very least, testified Dr. Lipschultz, the occupational exposure "aggravated significantly" an underlying condition.

In his award, the ALJ held that claimant's claim for compensability due to a pulmonary condition must be considered under the occupational disease provisions of the Workmen's Compensation Act, A.R.S. § 23–901.01. The ALJ found that there was a conflict in medical evidence and determined that the testimony and medical reports of Dr. Serbin were "most

probably correct and well founded." The ALJ then concluded that Dr. Serbin's testimony and reports, as well as the lay testimony given during the hearings, did not establish the six conjunctive compensability requirements of § 23–901.01.[1] Accordingly, the ALJ issued an award for a noncompensable claim.

Claimant raises five issues on appeal. We will discuss each in the order in which they were discussed by claimant. Claimant's first contention is that *Phoenix Pest Control v. Industrial Commission,* 134 Ariz. 215, 655 P.2d 39 (App.1982), has erroneously interpreted the intent of the legislature in enacting the 1973 amendments pertaining to occupational diseases and should be overruled. We disagree.

■■■ In *Phoenix Pest Control,* this court carefully reviewed the history of Arizona's workmen's compensation laws for conditions resulting from occupational diseases. Having done so, we concluded that the provisions of A.R.S. §§ 23–901.01 *et seq.* are applicable to *all* workmen's compensation claims which are factually based upon conditions resulting from occupational diseases. We then went on to hold that a claimant may not "elect" to have his claim processed as a routine workmen's compensation claim, rather than as provided in A.R.S. §§ 23–901.01 *et seq.* Section 23–901.01 makes occupational diseases as defined in A.R.S. § 23–901(12)(c)[2] compensable only if all six requirements are met. Nothing in claimant's brief convinces us

that the rationale of *Phoenix Pest Control* is unsound and we refuse to overrule the case.

■■■ Claimant's next contention is that the ALJ erred in considering the claim under the occupational disease portions of the Act since neither party had requested that it be so treated. As claimant points out, in *Phoenix Pest Control* we held: *"either* party is *entitled* to require that the claim be administered pursuant to the provisions of the workmen's compensation act governing occupational disease." (emphasis added). 134 Ariz. at 221, 655 P.2d at 45. However, we further noted:

> [A] carrier's contention that the claim constitutes an occupational disease claim should be advanced in a timely manner so as to *put the claimant on notice, prior to the close of the evidentiary phase of the proceeding,* of his or her possible burden of proving compensability under the occupational disease statutes. (emphasis added).

134 Ariz. at 221, 655 P.2d at 45 n. 5. Thus, it is clear that the purpose of "requesting" that the claim be considered as an occupational disease case is to put the claimant on notice prior to the close of hearings so that he may present evidence of compensability under the occupational disease statutes. There is no "election" as such. A.R.S. § 23–901(12)(c) requires that those claims constituting occupational disease claims are to be determined under the provisions of

---

1.  A.R.S. § 23–901.01 provides:

    The occupational diseases as defined by § 23–901, paragraph 12, subdivision (c) shall be deemed to arise out of the employment only if all of the following six requirements exist:

    1.  There is a direct causal connection between the conditions under which the work is performed and the occupational disease.

    2.  The disease can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment.

    3.  The disease can be fairly traced to the employment as the proximate cause.

    4.  The disease does not come from a hazard to which workmen would have been equally exposed outside of the employment.

5.  The disease is incidental to the character of the business and not independent of the relation of employer and employee.

    6.  The disease after its contraction appears to have had its origin in a risk connected with the employment, and to have flowed from that source as a natural consequence, although it need not have been foreseen or expected.

2.  A.R.S. § 23–901(12)(c) defines an occupational disease as:

    An occupational disease which is due to causes and conditions characteristic of and peculiar to a particular trade, occupation, process or employment, and not the ordinary diseases to which the general public is exposed, and subject to the provisions of § 23–901.01.

§ 23–901.01. There is no question that claimant was on notice of the applicability of § 23–901.01 in the case at bar. During his examination of Dr. Lipschultz, the following exchange took place:

Q. (BY MR. HOCKER): Was the condition for which you saw him in your opinion connected with the employment and flowed as a natural consequence of his employment?

MS. DOHERTY: Objection. Asked and answered.

JUDGE SHELEY: It probably has been answered. These questions sound as if they are coming from the Occupational Disease Provisions of the Workmen's Compensation Act, is that right?

MS. [sic] HOCKER: I am taking them right from 903.

Moreover, not only does claimant's counsel clearly indicate that he is aware that the occupational disease provisions apply, it appears that he has "elected" that the claim be administered pursuant to the occupational disease provisions.

The ALJ properly considered the claim under the provisions of A.R.S. § 23–901.01.

■ Claimant next maintains that his proof met the six conjunctive compensability requirements of A.R.S. § 23–901.01. As previously noted, the ALJ relied on the testimony of Dr. Serbin. Dr. Serbin could not state, to a reasonable degree of medical probability, that claimant's pulmonary condition was *caused* by his work environment. Although Dr. Lipschultz' testimony does seem to establish causation, the ALJ was free to reject his opinion and accept that of Dr. Serbin. *See Field v. Industrial Commission*, 128 Ariz. 425, 626 P.2d 155 (App.1981). In light of Dr. Serbin's inability to establish causation, claimant has failed to establish requirements one and three of A.R.S. § 23–901.01.[3]

■ It is claimant's further contention that, even if his underlying pulmonary condition was not caused by his employment, it was aggravated and therefore compensable. Claimant argues "that where a distinct employment hazard acts upon a preexisting weakness, disease, or susceptibility to produce a disabling condition or disease, the result is an occupational disease." However, this argument is contrary to the clear wording of A.R.S. §§ 23–901(12)(c) and 23–901.01. To be compensable as an occupational disease, all six conjunctive requirements of § 23–901.01 must be met. There must be a direct causal connection between the conditions under which the work is performed and the occupational disease, A.R.S. § 23–901.01(1), and the disease must be fairly traced to the employment as the proximate cause. A.R.S. § 23–901.01(3). Mere aggravation of a preexisting nonoccupational disease is not compensable under the statute.

Claimant cites cases from other jurisdictions to support his aggravation compensability argument. However, both cases cited are inapplicable since neither jurisdiction had an occupational disease statute as restrictive as does Arizona. The Arizona cases cited by claimant were not decided in light of the 1973 amendments requiring application of A.R.S. § 23–901.01 and are therefore inapplicable.

Our research has disclosed case law from jurisdictions with occupational disease statutes similar to Arizona's. In *State Ex Rel Miller v. Mead Corporation*, 58 Ohio St.2d 405, 390 N.E.2d 1192 (1979), the Supreme Court of Ohio addressed the issue of "whether a pre-existing disease, aggravated while a claimant is in the employ of an employer subject to the Workers' Compensation Act, may be the subject of compensation." The court cited from the Ohio occupational disease statutes as follows: "[e]very employee, who * * * contracts an occupational disease * * * is entitled to receive * * * compensation * * *." 390 N.E.2d at 1193. The court then noted that an occupational disease is compensable under the Ohio occupational disease statutes when "[t]he disease is contracted in the course of employment * * *." *Id.* The Ohio court held that aggravation of a

---

**3.** See footnote 1, *supra.*

preexisting disease is not compensable since "current statutory law does not permit such an outcome." *Id.*

Texas' occupational disease provisions are also similar to Arizona's and provide in part:

> Whenever the term "Occupational Disease" is used in the Workmen's Compensation Laws of this State, such term shall be construed to mean any disease arising out of and in the course of employment which causes damage or harm to the physical structure of the body and such other diseases or infections as naturally result therefrom. An "Occupational Disease" shall also include damage or harm to the physical structure of the body occurring as the result of repetitious physical traumatic activities extending over a period of time and arising in the course of employment; provided, that the date of the cumulative injury shall be the date disability was caused thereby. Ordinary diseases of life to which the general public is exposed outside of the employment shall not be compensable, except where such diseases follow as an incident to an "Occupational Disease" or "Injury" as defined in this section.

Tex.Rev.Civ.Stat.Ann. art. 8306, § 20 (Vernon Supp.1980). In *Texas Employers' Insurance Association v. Schaefer*, 598 S.W.2d 924 (Tex.Civ.App.1980), *aff'd* 612 S.W.2d 199 (1980), the Court of Civil Appeals of Texas addressed the issue of whether a nonoccupational disease, aggravated by employment, is compensable:

> Plaintiff ... argues that the aggravation, acceleration, or excitement of a nonoccupational disease is compensable. We disagree because, as we read the statute, an "ordinary disease of life" is one which does not arise out of the employment, but is one to which the general public is exposed. "Ordinary diseases of life," therefore, are only compensable when incident to an occupational disease or injury. (citations omitted).

598 S.W.2d at 928–29. In a subsequent decision, the Court of Appeals of Texas noted:

> To be compensable as an occupational disease, a disease must be one arising out of and in the course of the claimant's employment, and cannot be an ordinary disease of life to which the general public is exposed outside of the employment. To establish an occupational disease, there must be probative evidence of a *causal connection* between the claimant's work and the disease, i.e., the disease must be indigenous to the work, or must be present in an increased degree in that work as compared with employment generally. *Aggravation,* acceleration, or excitement of a non-occupational disease *does not constitute a compensable injury* under our Workers' Compensation Act. (citations omitted) (emphasis added).

*Home Insurance Company v. Davis,* 642 S.W.2d 268, 269 (Tex.App.1982).

In light of our legislature's choice to require that a claimant prove causation to sustain his claim under the workmen's compensation laws pertaining to occupational disease, we must hold that mere aggravation of a preexisting disease is not compensable. Any other conclusion would have the effect of completely nullifying the statutory provisions pertaining to occupational disease claims, since claimants would, as a matter of course, file the claim as an occupational disease and alternatively as an aggravation of a preexisting disease, thereby avoiding the necessity of proving causation. *See Phoenix Pest Control v. Industrial Commission, supra.*

Claimant also contends that the ALJ erred in improperly limiting his cross-examination of the employer's expert witness. Phelps Dodge called Dean Peckham, chief meteorologist at Phelps Dodge, to testify concerning the ambient air concentrations of sulfur dioxide in the Ajo area. Mr. Peckham testified as to the "primary standard" of sulfur dioxide concentrations established by the federal government. Mr. Peckham testified that the primary standard was the amount of sulfur dioxide air concentrations permissible, based upon a twenty-four hour average. Mr. Peckham

then testified that measurements of ambient air concentrations of sulfur dioxide in the Ajo area did not exceed the primary standard in either March or April of 1981. Mr. Peckham also testified that, to his knowledge, ambient air concentrations of sulfur dioxide had never reached the "alert level" as established by the State.

Claimant's attorney cross-examined Mr. Peckham concerning his reporting of ambient air concentrations of sulfur dioxide to the State Health Department. When asked if he reported his findings on the basis of one hour, three hour and twenty-four hour levels, Mr. Peckham responded that he did not, and that his reports to the State Department of Health were not that specific. Counsel then began questioning Mr. Peckham concerning one and three hour measurements of sulfur dioxide concentrations. Eventually the following exchange transpired between counsel and Mr. Peckham:

Q You are familiar with these air quality reports of Arizona, aren't you?

A I don't have any of those.

Q You have seen them?

A I don't have any. I guess I have not seen them.

Q Let me show you a booklet called "1981 Air Quality Controls of Arizona."

Do you see Table 22, specifically, the one that makes reference to Ajo, Arizona?

A Yes.

Q And it reports in 1980 there were eight times that the 3-hour standard was exceeded, wasn't it?

A That's what the report says.

Q In 1981, it was five times?

A Yes.

Q And that in each of the years between 1977 and 1981 it exceeded the 24-hour standard?

A I am sorry?

Q In each of the years—

A I am trying to see what this is really even for, because it doesn't say where; it just says they counted the numbers.

Respondent's counsel objected, claiming that the questioning by claimant's counsel was calling for speculation on the part of Mr. Peckham and requested that Mr. Peckham be given an opportunity to review the report. Following the objection, the ALJ noted that the report was not submitted in evidence. Claimant's counsel acknowledged that he had not submitted the report in evidence but claimed that it was proper to utilize it for impeachment of Mr. Peckham. The ALJ then inquired as to whether the report had been disclosed. Respondent's counsel stated that it had not been disclosed and belatedly objected, asking that the report be excluded as not being disclosed in the interrogatories or during prehearing discovery. Claimant's counsel countered by asserting that he had not been informed that Mr. Peckham would be called to testify. Following a short discussion, claimant's counsel admitted that he did not, in his interrogatories, specifically ask for the names of the witnesses to be called by Phelps Dodge. The ALJ then ascertained that respondent's counsel had specifically requested disclosure of "any reports" to be utilized at the hearing. The ALJ excluded the report, noting:

Mr. Peckham, on direct, has been asked only about the 24-hour standard, and I believe your questions to Mr. Peckham in showing him the 1981 standards were with regard to a 3-hour standard, which has not been identified by any witness as a primary standard, or the primary standard.

In that respect, I believe that this is improper cross examination through a document that has not been properly disclosed to opposing counsel and/or introduced in evidence.

So, therefore, the objection is sustained and no further questions concerning this 1981 document will be allowed.

Thus, the ALJ excluded claimant's use of the report on two grounds, the first being that use of the report constituted improper cross-examination, and the second, failure to disclose the report to respondent pursuant to its request.

■ We agree with the ALJ's conclusion that use of the report constituted improper cross-examination. Mr. Peckham stated that he was not familiar with the air quality reports of Arizona and had not seen them before. It is obvious he did not rely on the report while testifying on direct examination. Counsel did elicit from Mr. Peckham that there were hours during the day in which the ambient air concentrations of sulfur dioxide exceeded the primary standard, despite the fact that the twenty-four hour measurement did not. Counsel was merely restricted from utilizing a report which had not been relied upon by Mr. Peckham nor properly admitted into evidence. Counsel was, in effect, attempting to introduce substantive evidence under the guise of impeachment. *See Bryan v. John Bean Division of FMC Corporation*, 566 F.2d 541 (5th Cir.1978).

In *Ferguson v. Cessna Aircraft Company*, 132 Ariz. 47, 643 P.2d 1017 (App.1981), *appeal dismissed and remanded*, 132 Ariz. 38, 643 P.2d 1008 (1982), Division 2 of this court held:

> While rules 703 and 705 of the Arizona Rules of Evidence permit the disclosure of otherwise hearsay evidence to *illustrate the basis of the expert witness' opinion*, they do not permit the *unrelied upon opinions and conclusions of others* to be introduced in cross-examination for impeachment purposes. See *Bryan v. John Bean Division of FMC Corporation*, 566 F.2d 541 (5th Cir.1978). (emphasis added).

132 Ariz. at 49, 643 P.2d at 1019.[4] Clearly the report did not constitute permissible impeachment evidence. Accordingly, we find that the ALJ properly excluded use of

the report during claimant's cross-examination of Dean Peckham.[5]

Claimant's final contention is that the ALJ improperly intruded into his cross-examination of Dean Peckham, thereby depriving claimant of a "full and fair hearing". Claimant's counsel was questioning Mr. Peckham through the use of an air quality report. Respondent's counsel objected on the basis that the questioning called for speculation. The following exchange then transpired:

> THE JUDGE: I don't recall any reference to this document being appropriately submitted. Mr. Hocker, I don't see that the document was submitted in evidence.
>
> MR. HOCKER: I did not submit it in evidence, but the gentleman has testified and I think it is proper for impeachment.
>
> THE JUDGE: Has this document been disclosed, Ms. Doherty?
>
> MS. DOHERTY: No, it has not.
>
> I would like belatedly to object, that it be excluded as not being revealed in the interrogatories or in any prehearing discovery.

Claimant cites the cases of *Kosik v. Industrial Commission*, 125 Ariz. 535, 611 P.2d 122 (App.1980), and *Evertsen v. Industrial Commission*, 117 Ariz. 378, 573 P.2d 69 (App.1977), in support of his position that the ALJ deprived claimant of a fair hearing in asking whether the report had been disclosed. Neither case comes close to supporting claimant's assertion. In *Kosik*, the ALJ "interjected himself into the hearing to such an extent that he conducted a very substantial portion of the questioning of petitioner and the witness-

---

**4.** Rule 703, Arizona Rules of Evidence, provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Rule 705, Arizona Rules of Evidence, provides:

The expert may testify in terms of opinion or inference and give his reasons therefor

without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

**5.** Based upon our finding that the ALJ properly excluded use of the report as improper cross-examination evidence, we need not address the issue of whether it was properly excluded due to nondisclosure.

**600**

es." 125 Ariz. at 537, 611 P.2d at 124. Moreover, the court concluded that "the form and manner of questioning by the hearing officer was confusing, often misleading, and at times approximated adversarial cross examination." 125 Ariz. at 538, 611 P.2d at 125. The fact that the ALJ inquired as to whether the report had been disclosed is not even arguably comparable to the facts in *Kosik.*

 In *Evertsen,* the Industrial Commission had filed a brief before this court for an unrepresented claimant. In addressing the propriety of the Commission's action, we held:

> [T]he appearance of the Commission before this court in an adversary posture on behalf of the litigant which appeared before it, completely destroys the impartial character of the Commission as a tribunal where justice to both claimants and carriers should be meted out on an even-handed basis.

117 Ariz. at 383, 573 P.2d at 74. Apparently it is claimant's contention that the ALJ assumed an adversarial role by inquiring as to whether the air quality report had been disclosed to respondent's counsel. We refuse to conclude that the ALJ assumed an adversarial position based upon a single "inquiry". Moreover, due process requires that all parties appearing before the Industrial Commission receive a "fair and impartial" hearing. *Kosik, supra; Evertsen, supra.* Having reviewed the record of the hearings before the Commission, we find that all of the hearings were unquestionably fair and impartial.

For the foregoing reasons, the award is affirmed.

KLEINSCHMIDT, Acting P.J., and FROEB, J., concur.