Bobby G. SCHAEFER, Petitioner,

v.

TEXAS EMPLOYERS' INSURANCE ASSOCIATION, Respondent.

No. B–9580.

Supreme Court of Texas.

Dec. 31, 1980.

Rehearing Denied Feb. 18, 1981.

Edwards & Perry, Russell H. McMains, Corpus Christi, for petitioner.

Dyer & Redford, David J. Dunn and James W. Wray, Corpus Christi, for respondent.

DENTON, Justice.

This is a workers' compensation case in which Bobby G. Schaefer, plaintiff, sued Texas Employers' Insurance Association, defendant, to recover for an occupational disease. The jury found that the "atypical tuberculosis" suffered by Schaefer was an occupational disease which resulted in total and permanent disability. Judgment was rendered on the jury verdict. The court of civil appeals reversed and rendered judgment that Schaefer take nothing. 598 S.W.2d 924. We affirm the judgment of the court of civil appeals.

Bobby G. Schaefer was employed by C & R Plumbing Company in Flour Bluff, Texas as a backhoe operator in 1958 and became a plumber in 1964. He worked primarily in rural areas of Nueces County. Routinely, Schaefer was required to crawl and tunnel underneath houses to repair or install plumbing. At least once a month during the course of his employment, he worked in soil contaminated with the feces of birds, other fowl, sheep, goats, dogs, cats, and humans. In addition to these conditions, the owner of the plumbing shop where Schaefer worked raised birds commercially in a shed attached to the back of the shop to which Schaefer was exposed. On June 1, 1976, Schaefer bumped his head on a pipe and sustained a nosebleed which required hospitalization. While in the hospital, routine x-rays showed that Schaefer was suffering from tuberculosis.

Schaefer was later diagnosed as having Group III mycobacterium intracellularis. Sometimes referred to as "atypical tuberculosis," this rare disease attacks lung tissue scarring the lungs to the point that they cease to function. It is considered incurable and is usually fatal. The disease is caused by a bacteria, mycobacteria intracellulare. Schaefer's illness is in an advanced stage and he has been unresponsive to drug therapy. Although he returned to work following his hospitalization, physical exertion has aggravated or accelerated his condition and he is now unable to work.

Mycobacteria intracellulare is the general classification for a complex of bacteria which are divided into multiple groups and subgroups of specific bacterium. Schaefer suffers from Avium Battey (Group III) mycobacterium intracellularis. Group III is composed of at least thirty serotypes (subgroups) some of which are non-disease producing, some of which are only slightly pathogenic, and some of which are extreme-

ly virulent. Although the group is referred to as "Avium," not all of the serotypes are avian, i. e., pathogenic to fowl. The avian strains are considered the most pathogenic. Apparently, two avian strains and roughly five non-avian strains are capable of producing disease in man.

Medical authorities are uncertain as to the etiology of mycobacteria intracellularis (m. intracellularis). It is more commonly encountered in coastal areas than non-coastal regions. Studies have shown the bacteria to be present in the gulf coast states, England, Wales, and Japan. The bacteria has been identified in a variety of environments: soil, mud, dust, tap water, standing water, sea water, sea spray, milk, ice cream, and cheese. The organism is not affected by pasteurization. It has never been identified conclusively in human waste. Medical authorities are uncertain but apparently the bacteria enters the body by either inhalation, inoculation, or ingestion. The lungs are the most common site of infection.

Incidence of this disease is extremely rare, approximately three cases per million population annually. Certain groups, however, are more susceptible to m. intracellularis than others. For instance, persons engaged in dusty occupations, such as coal miners and sandblasters, have been shown more likely to contract the disease because their immune mechanisms are weakened by inhalation of silicon dioxide. There is also a higher incidence of disease among farmers who work in dirty environments, especially those contaminated by fowl droppings, for reason of their increased exposure to the organism. No studies have ever associated m. intracellularis with the plumbing trade. In fact, according to the record, this is the first reported case in which a plumber has contracted the disease.

The bacteria present in Schaefer's sputum was identified, by laboratory analysis, only as belonging to Group III of the complex m. intracellulare. The organism was

not serotyped,[1] therefore, it is not known whether he has an avian or non-avian strain. Further, the organism from which Schaefer suffers has not been isolated in any of the environments where he worked or lived.

Trial of the case consisted of the testimony of Bobby Schaefer; the testimony, by deposition, of Dr. John S. Chapman, expert witness on behalf of Texas Employers' Insurance Association (T.E.I.A.); and the testimony of Dr. William E. Anderson, Schaefer's treating physician. The jury found the atypical tuberculosis suffered by Schaefer to be an occupational disease compensable under the Workers' Compensation Act. The trial court rendered judgment for the plaintiff. The court of civil appeals reversed the judgment and rendered, holding there was no evidence of probative force to support the jury finding. The question before us is whether the testimony of Schaefer's expert, Dr. William E. Anderson, is some evidence to support the jury finding that Schaefer was exposed to or contracted m. intracellularis while in the course and scope of his employment.

■ In deciding a "no evidence" point, which is a question of law, we consider only that evidence and reasonable inferences therefrom which viewed in its most favorable light supports the jury finding and we must reject all evidence or inferences to the contrary. *East Texas Theaters, Inc. v. Rutledge*, 453 S.W.2d 466, 467 (Tex.1970); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

The pertinent statute is section 20 of the Workers' Compensation Act. Tex.Rev.Civ. Stat.Ann. art. 8306 which provides:

Wherever the terms "Injury" or "Personal Injury" are used in the Workmen's Compensation Laws of this State, such terms shall be construed to mean damage or harm to the physical structure of the body and such diseases or infections as

---

1. Serotyping is a laboratory procedure whereby relatively undifferentiated members of a complex of organisms can be distinguished as to specific features of particular strains or subtypes of organisms.

naturally result therefrom. The terms "Injury" and "Personal Injury" shall also be construed to mean and include "Occupational Diseases," as · hereinafter defined. Whenever the term "Occupational Disease" is used in the Workmen's Compensation Laws of this State, such term shall be construed to mean any disease arising out of and in the course of employment which causes damage or harm to the physical structure of the body and such other diseases or infections as naturally result therefrom. An "Occupational Disease" shall also include damage or harm to the physical structure of the body occurring as the result of repetitious physical traumatic activities extending over a period of time and arising in the course of employment; provided, that the date of the cumulative injury shall be the date disability was caused thereby. Ordinary diseases of life to which the general public is exposed outside of the employment shall not be compensable, except where such diseases follow as an incident to an "Occupational Disease" or "Injury" as defined in this section.

■ Here, the specific problem is establishing a causal connection between the disease and Schaefer's employment. Causation may be proved by testimony of experts. In *Parker v. Mutual Liability Ins. Co.*, 440 S.W.2d 43, 46 (Tex.1969), this Court stated:

[P]robabilities of causation articulated by scientific experts have been deemed sufficient to allow a plaintiff to proceed to the jury. For while a scientific training conceives of anything as possible, coincidence can be measured and generalizations similar to but not the same as uniform physical laws can be drawn from the probability of a result following a cause. In fact, the relationship between cause and its effect per se without theoretical explanation, can be nothing more than probable relationships between particulars. But this probability must, in equity and justice, be more than coincidence before there can be deemed sufficient proof for the plaintiff to go to the jury.

We have held that in workers' compensation cases expert medical testimony can enable a plaintiff to go to the jury if the evidence establishes "reasonable probability" of a causal connection between employment and the present injury. *Stodghill v. Texas Employers' Ins. Ass'n*, 582 S.W.2d 102, 105 (Tex.1979); *Parker v. Mutual Liability Ins. Co.*, 440 S.W.2d 43, 46 (Tex.1969); *Galveston, H. & S. A. Ry. Co. v. Powers*, 101 Tex. 161, 105 S.W. 491, 493 (1907); see Steakley, *Expert Medical Testimony in Texas*, 1 St. Mary's L.J. 161, 163 (1969). In the absence of reasonable probability, the inference of causation amounts to no more than conjecture or speculation. *Insurance Co. of North America v. Myers*, 411 S.W.2d 710, 713 (Tex.1966). This precludes the plaintiff from going to the jury. In *Stodghill v. Texas Employers' Ins. Ass'n, supra* at 105, we wrote that an expert need not use the magic words "reasonable medical probability" if the evidence establishes that this is the substance of his opinion. *See also Lucas v. Hartford Ins. & Indem. Co.*, 552 S.W.2d 796 (Tex.1977); *Insurance Co. of North America v. Kneten*, 440 S.W.2d 52 (Tex.1969); *Otis Elevator Co. v. Wood*, 436 S.W.2d 324 (Tex.1968). The substance of the testimony, not its form, is determinative. *Western Cas. & Sur. Co. v. Gonzalez*, 518 S.W.2d 524, 526 (Tex.1975). In *Insurance Co. of North America v. Myers*, 411 S.W.2d 710, 713 (Tex.1966), this Court stated that reasonable probability must be determined by considering the substance of the expert's testimony and "does not turn on semantics or on the use by the witness of any particular term or phrase."

Dr. Anderson testified that in his opinion, based on reasonable medical probability, Schaefer's disease resulted from his employment.

Q [A]ssume the term occupational disease means a disease which arises out of and in the course of employment which causes damage or harm to the physical structure of the body and I'll ask you whether or not you have an opinion based on reasonable medical · probability as to whether the atypical tuberculosis from which Mr. Schaefer

is suffering, as it applies in his case, whether it is an occupational disease within the definition?

A Yes, sir. I think it is.

The basis for his opinion is that persons engaged in "dirty" occupations, such as farmers, tend to have a greater exposure to the bacteria; that Schaefer frequently worked in soil contaminated by bird droppings; that Schaefer suffers from one of the serotypes of m. intracellularis; and, therefore, he has an occupational disease. Notwithstanding Dr. Anderson's opinion, there is a crucial deficiency in the proof of causation. The evidence fails to establish that any bacteria was present in the soil where Schaefer worked. Quoting from Dr. Anderson:

Q I understand that, I mean in the Gulf Coast areas you don't expect to find them more particularly let's say, for example that it hasn't been proven m. intracellularis can be found in Nueces County. There's not ever been any studies that show that, are there?

A No.

.    .    .    .    .

Q All right, so it goes without saying that *you do not know whether fowl droppings had anything to do with the chain that caused this germ to find lodgment in this man's lungs?*

A Not specifically, no, sir.

Q Well, you don't know at all because you don't know what serotype his bacterium is?

A I think it would make very good sense that it all fits together.

Q You don't know it, do you?

A *I don't know it because we don't have soil samples.*

The evidence also fails to establish either the specific strain of bacteria from which Schaefer suffers or where or how he contracted it. This is evident from Dr. Anderson's testimony quoted below:

Q Now the only reason that you think this man has intracellularis is the fact you've gotten a report from the State Health Laboratory that he has intracellulare?

A Sir, about thirty reports.

Q All right, now those do not constitute however a serotyping of the bacterium, do they?

A That's correct. They do not.

Q Okay. Now, let's talk about that just a minute. The Group III or Avium Battey complex is a group of some thirty or more serotypes of bacterium or mycobacterium, aren't they?

A Right.

Q And some of them are of the avian type, that is those which are pathogenic to fowls, is that correct?

A Yes, sir, to (sic) basic avian types.

Q All right, in other words, two out of the thirty are avian type serotypes of the intracellularis, is that correct?

A Yes, sir.

Q Now those are the ones, of course, that would, when we say they're pathogenic we mean they produce a disease in fowls, don't we?

A Yes, sir.

Q All right sir and the other twenty-eight types of intracellulare or more, whatever, do you happen to know how many different types of intracellulare there are?

A They keep adding more all of the time.

Q So the numerous other serotypes or subtypes of intracellularis are not avian types is that correct?

A That's my understanding. *I don't profess to be an authority on this*, not serotypes.

Q When you get to the point, you don't know anything?

A The problem, Mr. Wray, is that we don't have serotyping available here so we have no information on this, Mr. Schaefer's serotypes.

Q I understand that. Now, *so the point of the matter is you do not know whether the intracellularis he has is an avian, caused by the avian type bacteria?*

A   Not exactly.

Q   *You just don't know that one way or the other?*

A   *That's correct.*

Q   There are other pathogenic or disease causing intracellularis serotypes than the avian type, isn't that correct?

A   Yes, sir.

Q   All right, sir. Now, *you have not made any tests to show that intracellularis of any part is present in Mr. Schaefer's work environment?*

A   That's correct. *I have not.*

Q   And if you were to make a test in some place where he worked and you found some sort of general indifferentiated mycobacterium intracellulare, you still wouldn't know whether that's what caused his disease unless it was serotyped?

A   That's correct.

Q   In other words, *in order to show that this man got this germ on the job you would have to find the serotype of the intracellularis in a place he had worked and you would have to identify that as the specific serotype that has caused his disease?*

A   Sir, *that's my understanding* of serotyping; it's a more specific test.

.   .   .   .   .

Q   Now follow me closely on this, if you will please, Doctor. *There is a logical void in your conclusion in that this man was more exposed to m. intracellularis by reason of working under houses where, which were contaminated by chicken droppings, barnyard fowl, and animal droppings because you don't, you do not know that this man has an avian type m. intracellularis, do you?*

A   Well, in fact, if you'd be interested—

Q   Wait a minute, answer my question. You do not know he's infected with avian type intracellularis?

A   It says from the State Department of Health it's called the Avian Complex.

Q   But that is a general term that applies to all Group III, isn't that correct Doctor?

A   Yes, sir but they're all bad bugs and they all cause disease.

Q   Follow me Doctor, *when you say it's avian type or the State Health Department says it's avian type, that does not mean it's an avian serotype?*

A   *We don't because we haven't tested for it.*

Q   You don't know if it's an avian serotype? You don't know one way or other? It's called Avium-Battey Type and that's a name given to all Group III avian bacteria?

A   Obviously it's an important part, that's why they call it Avium-Battey.

Q   That is known, the name given to all of them and not all of them are pathogenic to fowls, are they?

A   Again, *I don't know. I know it's an important part of the complex. And as far as I'm concerned that's what he has.*

[All emphasis added by this court.]

Dr. Anderson assumes that Schaefer is infected with an avian serotype m. intracellularis pathogenic to fowl. He further assumes that this serotype was present in bird droppings where Schaefer worked. It is admitted that the particular strain of m. intracellularis from which Bobby Schaefer suffers has not been identified. It is also admitted that the manner in which the disease was transmitted to Schaefer is unknown. It is further admitted that there is no evidence that the bacteria is present in the soil where Schaefer worked, or even in Nueces County.

We have reviewed the substance of Dr. Anderson's testimony in its entirety and we find that it does no more than suggest a possibility as to how or when Schaefer was exposed to or contracted the disease. We hold that his opinion is not based upon reasonable medical probability but relies on mere possibility, speculation, and surmise. *Insurance Co. of North America v. Myers,* 411 S.W.2d 710, 713 (Tex. 1966); *see Stodghill v. Texas Employers'*

*Ins. Ass'n*, 582 S.W.2d 102, 105 (Tex.1979). We hold there is no evidence that the disease suffered by Bobby Schaefer is an occupational disease "arising out of and in the course of employment." *See* Tex.Rev.Civ. Stat.Ann. art. 8306, § 20. The fact that proof of causation is difficult does not provide a plaintiff with an excuse to avoid introducing some evidence of causation. *Parker v. Employers Mut. Liab. Ins. Co.*, 440 S.W.2d 43, 46 (Tex.1969). To ignore the substance of Dr. Anderson's testimony and accept his opinion as "some" evidence simply because he used the magic words "reasonable probability" effectively removes this Court's jurisdiction over any case requiring expert opinion testimony. Under such view, so long as an expert states the words "reasonable probability," in giving his opinion, there would be some evidence. The question would then be solely one of sufficiency of the evidence over which this Court has no jurisdiction. *See Custom Leasing, Inc. v. Texas Bank & Trust Co.*, 491 S.W.2d 869, 872 (Tex.1973).

■ The court of civil appeals held that Schaefer's Group III mycobacteria intracellularis is an "ordinary disease of life to which the general public is exposed outside of the employment." 598 S.W.2d at 928. Schaefer argues that ordinary diseases of life are limited to illnesses such as common colds and the flu, and do not include exotic diseases such as m. intracellularis. Schaefer relies on *Bewley v. Texas Employers' Ins. Ass'n*, 568 S.W.2d 208 (Tex.Civ.App.— Waco 1978, writ ref'd n. r. e.). *Bewley* held that an employee's cold, sore throat, and pneumonia resulting from exposure to inclement weather in the course of employment were not compensable. *Id.* at 211. The court distinguished other cases which permitted recovery for various respiratory diseases stemming from accidental inhalation of large quantities of noxious gases, dust, or other foreign substances. *Id.* at 210. We disagree with Schaefer's contention. The fact that m. intracellularis is an extremely rare disease afflicting very few persons does not exclude it from being a disease to which the general public is exposed outside of employment. M. intracel-

lularis has not been found to be an occupational disease. It has not been shown to be indigenous to Schaefer's work or present in an increased degree in that work. *Mueller v. Charter Oak Fire Ins. Co.*, 533 S.W.2d 123, 126 (Tex.Civ.App.—Tyler 1976, writ ref'd n. r. e.); *see* 1B Larson, *The Law of Workmen's Compensation* § 41.32 (1973). Ordinary diseases of life are compensable only when incident to an occupational disease or injury. *Mueller v. Charter Oak Fire Ins. Co., supra* at 126; *see* 1B Larson, *supra* § 41.32; Sartwelle, *Worker's Compensation*, 32 Sw.L.J. 291, 350 (1978).

The judgment of the court of civil appeals is affirmed.

## ON MOTION FOR REHEARING

SPEARS, Justice, dissenting.

I respectfully dissent.

The effect of the majority's opinion is that the opinion testimony of an expert as to "probable cause" can be ignored by an appellate court if the court reaches an opposite conclusion based upon its own evaluation of the evidence. Such a rule is contrary to the prior decisions of this court. *Stodghill v. Texas Employers' Ins. Ass'n*, 582 S.W.2d 102 (Tex.1979); *Lucas v. Hartford Acc. & Indem. Co.*, 552 S.W.2d 796 (Tex.1977); *Parker v. Employers Mutual Liab. Ins. Co. of Wisc.*, 440 S.W.2d 43 (Tex. 1969). In each of those cases, we held that expert medical testimony that in reasonable medical probability there existed a causal connection between the disabling disease and injury or death was sufficient to overcome a "no evidence" objection. The majority's heavy reliance on *Insur. Co. of North America v. Myers*, 411 S.W.2d 710, 713 (Tex.1966) is misplaced. There, the doctor would go no further than to say there was a *possibility* that the injury caused the death, not that it was in reasonable medical probability the cause as is the medical testimony in this case.

Here, the evidence is that the employee, Bobby Schaefer, worked in a rural setting as a plumber, and was frequently exposed

to soil contaminated with poultry and animal droppings. Dr. Anderson testified that in his opinion, Schaefer's disease was of the avian strain and related to his massive exposure to contaminated soil associated with his occupation as a plumber.[1]

The majority complains that the particular type of mycobacterium intracellularis contracted by Schaefer was never identified by serotyping, and thus it was not known whether he had an avian strain, which is pathogenic to fowls, or a non-avian strain. Further, says the majority, the organism causing his problem has never been identified to be located in the soils where Schaefer worked. Plaintiff's expert was Dr. William Anderson, a medical doctor who was board certified in internal medicine with specialized training in pulmonary medicine, treatment of diseases of the lungs. He testified that the most virulent and treat-ment-resistant form of the disease is an avian type, and that Schaefer's disease is particularly virulent and untreatable. It was so much so that Dr. Anderson characterized Schaefer's as "the worst type of atypical disease that you can get," and "his is by far the worst resistant to treatment of any I've ever seen." Thus, the *probability* of the causal connection as testified to by Dr. Anderson is more than a possibility or a surmise and conjecture. If Schaefer had offered proof that the organism causing his disease was actually present in his work environment, i.e., in the very soil in which he worked, expert testimony of probable causation would not have been necessary; the jury would be able to infer the existence of this causal connection by the exercise of their general experience and common sense. *Commercial Standard Fire and Marine Co. v. Thornton*, 540 S.W.2d 521, 524

1. Schaefer cites the following testimony from Dr. Anderson as support for the affirmative jury finding on the occupational disease special issue.

> A  ... But by and large I think we always think of these as soil organisms because this is where they seem to be most prevalent.
> Q  Has there been any studies reported that has related occupations or environments to contracting this disease?
> A  Yes, sir. Some of the ones that have been a greater risk are farmers, people who are exposed to soil ...
> \*    \*    \*    \*    \*    \*
> Q  Is this disease associated in any way with birds or poultry?
> A  It can be; yes, sir ... (S.F. 147).
> \*    \*    \*    \*    \*    \*
> A  Yes, sir. I think it does and one of the things I should have said before and it's in Dr. Chapman's book is that they've isolated a lot of organisms from people and to me it seems perfectly plausible, anybody exposed to that type of soil, contaminated soil, repeatedly crawling under houses and the kind of work this man was doing repeatedly, he had a perfectly beautiful opportunity to acquire and reinoculate himself with these organisms.
> ... In my opinion the two most important factors have to do with whether a patient develops the disease or not, how much he is inoculated to organisms. The massive exposure is very important ...
> Q  ... Tell us whether or not you have an opinion in reasonable medical probability as to whether Mr. Schaefer has been subjected to massive inoculations?
> A  In my opinion, he has.

> Q  Why do you say that?
> A  The nature of his work, the fact he's around contaminated soil, the birds he's been around ... (S.F. 150–151).
> \*    \*    \*    \*    \*    \*
> ... This organism is in soil. It's in particular soil where it's been around birds ... (S.F. 152).
> Q  Taking into account of the things we talked about and your knowledge of Mr. Schaefer and the assumptions that I have asked you to make with regard to the employment that he is following, I'm going to ask you this question. And the question I'm going to ask you, to assume the term occupational disease means a disease which arises out of and in the course of employment which causes damage or harm to the physical structure of the body and I'll ask you whether or not you have an opinion based on reasonable medical probability as to whether the atypical tuberculosis from which Mr. Schaefer is suffering, as it applies in his case, whether it is an occupational disease within that definition.
> A  Yes, sir. I think it is. (S.F. 157–158).
> \*    \*    \*    \*    \*    \*
> Q  Now, I want you to assume further that in the definition of an occupational disease that we are required to exclude ordinary diseases of life. In your opinion is the atypical tuberculosis of which Mr. Schaefer is suffering, is that one of the ordinary diseases of life from the medical standpoint?
> A  No, sir, it's not. (S.F. 158–159).

(Tex.Civ.App.—Texarkana 1976, writ ref'd n.r.e.).

What is most disturbing about the majority's opinion is the retreat from the rule often announced by this court, i.e., the existence of direct medical testimony of a probable causal relationship between an occupational disease and the employment obviates the necessity for this court to concern itself with the scintilla rule or drawing inferences. *Lucas v. Hartford Acc. & Indem. Co., supra.* The majority, in effect, would require Schaefer to scientifically exclude all other reasonable explanations of his contracting his disease except for his employment before the doctor's expert opinion that the employment was the probable cause would constitute *any* evidence sufficient to go to the jury. This sounds more akin to a "beyond a reasonable doubt" test than it does the preponderance of the evidence test.

While Dr. Anderson admitted he wasn't absolutely certain that Schaefer's disease was connected to his occupational activities, he held firm to his opinion that Schaefer's occupation was the *probable* cause of his disease. Both doctors testified that pinning the exact cause to a specific source was next to impossible. This is clear from the testimony of defendant's expert witness, Dr. Chapman, a leading authority in the field. He testified that to determine the exact type of mycobacterium intracellularis Schaefer contracted it would require serotyping cultures of everything in Schaefer's environment, an enormous technical problem.[2] Dr. Anderson's testimony that Schaefer's massive exposure to contaminated soil was in reasonable medical probability the cause of his atypical disease stands unretracted and undamaged in the record of this case.

Surely this court would not consciously embrace a rule that a plaintiff must eliminate all other possible causes of his occupational disease to present a fact issue upon which a jury may render a valid verdict in his favor. There is clearly *some* evidence of causation when Dr. Anderson's firm assertion that the causal connection was medically probable is coupled with the environment, conditions, and nature of Schaefer's work and the virulence and resistance of treatment of the disease he had being characteristic of the avian strain.

The doctor's failure to perform additional serotyping tests does not render his opin-

2. Dr. John S. Chapman, professor of internal medicine at Southwestern Medical School of the University of Texas System, testified for the defendant. He is one of the leading authorities in the country on the subject of atypical mycobacteria. This testimony was in part:

Q Suppose that somebody was actually trying to trace down the likeliest place that Bobby G. Schaeffer could have become exposed to this mycobacterium intracellularis—
A Yes.
Q What would be necessary, first of all, with regard to determining the exact type of it that he had?
A Well, you would have to identify his organism by serotyping. You would have to take cultures of just about everything in his environment, which would include the dust of his own house, the tap water from his own taps, the milk and poultry and eggs and everything else that he, himself, had ingested; samples of soil where he had worked, samples of water where he had worked, possibly samples of sea water.
It would take this kind of a thing, to say with certainty yea or nay. And each one of the—
Any time you isolate an intracellulare organism from any of these sources, it would have to be serotyped, too. So that the technical problem would be enormous.
Q So far as you can tell from the hospital records and reports of Dr. Anderson and Dr. Pettigrove, that sort of study has not been done?
A Oh, I'm sure it has not. It certainly doesn't appear there.
Q All right, sir. Specifically going back to the fact that this man might have to crawl around in dirt, crawl under houses, dig under silt and burrow in soil that might have been contaminated by human excrement, say septic tanks or something of that sort, would that change your opinion about the relationship between his disease and his occupation?
A I don't know that it would, no. Since we know so little about all the requirements for the development of this disease, I don't know that we could specifically relate any of his activities to his infection. We have tried to do this with other patients. I have tried, specifically, with a fair number of the individuals that I have seen, to try to get from them some consistent source, and I have not had any luck.

**208** ■

ions non-probative any more than the failure of an orthopedic surgeon to perform a myelogram can legally preclude him from giving his opinion that a patient has a ruptured disc.  The failure only goes to the weight of his testimony, not its admissibility.  Dr. Anderson's expert opinion is that there is a probable causal connection between Schaefer's employment and his disease.  His opinion is evidence.

I would reverse the judgment of the court of civil appeals and render judgment in accordance with the trial court's judgment and the jury verdict.

CAMPBELL, RAY and WALLACE, JJ., join in this dissent.