**Fred HERNANDEZ, Sr., Individually and as Representative and Sole Heir of the Estate of Concepcion Hernandez, Deceased, Appellant,**

v.

**Leo L. ALTENBERG, M.D.; Miguel E. Najera, M.D.; Miguel E. Najera, M.D., P.A.; Victor D. Trevino, M.D.; Victor Lopez, M.D.; Ralph Nimchan, M.D.; Ralph Nimchan, M.D., P.A.; and Anesthesia Specialists of Laredo, P.A., Appellees.**

No. 04–94–00079–CV.

Court of Appeals of Texas, San Antonio.

May 24, 1995.

Rehearing Overruled Aug. 17, 1995.

---

David Rodriguez Weiner, Janet Dann, Law Offices of Windle Turley, P.C. Dallas, for appellant.

Peter L. Kilpatrick, Foster, Lewis, Langley, Gardner & Banack, Inc., San Antonio, Ryan G. Anderson, George F. Evans, Jr., Ruth Greenfield Malinas, Ball & Weed, P.C., San Antonio, Dale Hicks, Cathy J. Sheehan, Plunkett, Gibson & Allen, Inc., San Antonio, Diana Moore, Blackwell, Sanders, Matheny, Weary & Lombardi, Overland Park, KS, Carlos David Castillon, Freeman & Castillon, Laredo, for appellees.

Before CHAPA, C.J., and HARDBERGER and PEEPLES,[1] JJ.

## OPINION

HARDBERGER, Justice.

This case explores the complexity of a medical malpractice cover-up and whether there is enough evidence of proximate cause

1. Judge David Peeples not participating.

to allow a case to go the jury for a factual determination. While it is a close question and excellently briefed, we hold, given the standard of review governing an instructed verdict, that there is sufficient evidence of negligence and proximate cause to defeat an instructed verdict. We reverse and remand.

### The Facts

A metal guide wire, originally used to help guide a catheter, was accidently left in the heart of Mrs. Hernandez on May 6, 1990. Mrs. Hernandez was being treated for a heart attack. Despite the fact that the guide wire was discovered by X-ray the next day, and was known about by all five defendant doctors, neither she nor any member of her family was ever told of the error. On the contrary, the patient and her family were given false information about the need for another fictitious operative procedure as an excuse for removing the wire. The wire was allowed to stay in Mrs. Hernandez for 17 days while a suitable cover-up operation was arranged. Until the date of her death, June 8, neither she nor her family was ever told of the wire, or given the true reason for the second operation. Nor did any of the doctors tell the family then. The family finally found out about the wire and subsequent cover-up following Mrs. Hernandez's death through an anonymous letter. This suit followed. It is the position of the plaintiffs, Mrs. Hernandez's family, that the lengthy delay in removing the wire from Mrs. Hernandez's heart caused a blood clot, which in turn caused her death. It is the defendant doctors' position that there is no probative evidence that a blood clot formed on the wire, or that it caused her death. In short that there was no proximate cause between the negligence and the death. The trial court agreed and instructed a verdict in favor of the defendants.

### The Timetable

The following dates in 1990 are pertinent to the discussion:

May 6   Guide wire accidently left in Mrs. Hernandez's heart by Dr. Altenberg.

May 7  Dr. Lopez discovers the guide wire in reviewing X-rays.

May 7  Dr. Nimchan, Dr. Trevino, Dr. Najera told of the guide wire left in the heart.

May 10  Mrs. Hernandez's family falsely told catheter was infected as a guise for removing the guide wire. No mention was made of the guide wire. No consent was given.

May 23  Mrs. Hernandez's family again falsely told catheter infected. No mention was made of guide wire. Consent given.

May 23  Dr. Najera removes the guide wire and throws it away. He also changes the catheter from one side to the other to cover the reason for the operation.

June 1  Mrs. Hernandez discharged from the hospital.

June 8  Mrs. Hernandez dies.

post-June 8  Hernandez family gets an anonymous letter telling them about the guide wire.

Having no reason to think there was any evidence of malpractice, no autopsy of Mrs. Hernandez was done and therefore a physical examination of the exact cause of death was never done.

Appellees moved for directed verdicts on appellant's causes of action for negligence and gross negligence. The sole ground in support of their motions was that appellant had failed to make a sufficient showing that the conduct of appellees was, in reasonable medical probability, a proximate cause of Mrs. Hernandez's death.

■ The standards of an appellate court in a directed verdict case are that we must view the evidence in the light most favorable to the party against whom the verdict was rendered and disregard all contrary evidence and inferences. *Qantel Business Sys. Inc. v. Custom Controls Co.,* 761 S.W.2d 302, 303 (Tex.1988). However, it does not appear that there is any dispute to the above facts. The defendant doctors admit the conspiracy of silence, the overt misleading of the plaintiffs and the destruction of the offending wire. Nevertheless they say there are no facts that support plaintiffs' expert's opinion because

no matter how well he phrases it, he does not know whether or not the wire caused a blood clot, and even if it did, that it caused Mrs. Hernandez's death.

## Standard of Review

In his sole point of error, Hernandez argues that the trial court erred in granting a directed verdict because he offered sufficient expert testimony on the issue of proximate cause to warrant submission of the case to the jury. Hernandez offered the testimony of Dr. Ronald Katz to support the negligence claims against appellees. Dr. Katz is an anesthesiologist at UCLA Medical Center, a professor of anesthesiology and former chairman of the UCLA Department of Anesthesiology. He testified to his opinions in this case including the proximate cause of Mrs. Hernandez death, based on reasonable medical probability. Appellees argue that Dr. Katz's testimony is "no evidence" of causation for three reasons: (1) Dr. Katz's admission that he was not a hematologist rendered his proximate cause testimony incompetent; (2) Dr. Katz's causation opinions lacked any factual basis; and (3) Dr. Katz's testimony regarding proximate cause is not based on the proper "reasonable medical probability" standard.

■ When reviewing a directed verdict we must determine whether there is any evidence of probative force to raise fact issues on the material questions presented. *Collora v. Navarro,* 574 S.W.2d 65, 68 (Tex. 1978). We consider all of the evidence in the light most favorable to the party against whom the verdict was instructed and disregard all contrary evidence and inferences. *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex.1983); *University Nat'l Bank v. Ernst & Whinney,* 773 S.W.2d 707, 709 (Tex.App.—San Antonio 1989, no writ). Every reasonable inference must be indulged in the non-movant's favor. *Trenholm v. Ratcliff,* 646 S.W.2d 927, 931 (Tex.1983). If there is any conflicting evidence of probative value on any theory of recovery, the issue is for the jury, and an instructed verdict is improper. *White,* 651 S.W.2d at 262.

Dr. Katz testified that appellee physicians conduct fell below the standard of care in several respects. First, Dr. Altenberg's conduct was below the standard of care because he left the metal guide wire in Mrs. Hernandez. He also failed to do a follow up X-ray, and he failed to note in the charts that the metal wire had been left inside Mrs. Hernandez. The other appellees' care and treatment fell below the standard of care because they did not inform the family about the guide wire being inside the patient and they did not remove the guide wire within twenty-four hours of its discovery. The plaintiff's expert testified that, based on reasonable medical probability, Mrs. Hernandez would not have died on June 8, 1990, had the wire been removed immediately. According to Dr. Katz, blood clots form very easily on metal guide wires. He said, in reasonable medical probability, that in the 17 days the guide wire was negligently left in Mrs. Hernandez a blood clot formed on the wire, and subsequently dislodged, and reached her lungs, causing a pulmonary embolus that killed her. Appellant argues that this evidence is sufficient to entitle him to a jury finding on whether there was negligence and proximate cause, or not. We agree.

### The Expert's Competency

■ Appellee physicians first challenge Dr. Katz's qualifications to testify as to negligence and proximate cause. Specifically, appellees allege that only a specialist, namely a hematologist, would be qualified to give the opinions rendered by Dr. Katz. It is undisputed that Dr. Katz is a medical doctor and that all of the defendants in this case are medical doctors. Dr. Katz is a former chairman of the U.C.L.A. Department of Anesthesiologist, and is currently an anesthesiologist at the U.C.L.A. Medical Center. Dr. Katz testified that as a practicing anesthesiologist he regularly inserts catheters. He outlined the acceptable standard of care in inserting catheters, taking X-rays to make certain that the catheter was correctly placed and in removing the metal guide wire. Dr. Katz also explained why it is crucial to immediately remove the metal guide wire, i.e., the danger of blood clots forming on the metal wire.

■ When bringing suit against a medical doctor, the claimant must offer proof by a doctor of the same school of practice as the defendant that the diagnosis or treatment complained of constituted negligence and that it was a proximate cause of the patient's injuries. *Hart v. Van Zandt,* 399 S.W.2d 791, 797 (Tex.1965). It is well settled in Texas law that a doctor does not have to be of one specialty to testify regarding a problem in another specialty. *Burlington Northern R. Co. v. Harvey,* 717 S.W.2d 371, 378 (Tex.App.—Houston [14th Dist.1986], writ ref'd n.r.e.).

> The requirement of the same school of practice means that if the defendant doctor is a medical doctor, it is sufficient that the expert medical witness also is a medical doctor. *Hart v. Van Zandt, supra.* He need not be a specialist in a particular area in which he was called to testify, so long as he possessed knowledge and skill not possessed by people generally.... The fact that Dr. Condo is not a specialist in neurosurgery goes to his credibility with the jury, not the admissibility of his testimony.

*Heise v. Presbyterian Hospital of Dallas,* 888 S.W.2d 264 (Tex.App.—Eastland 1994, n.w.h.). *See also, Hardware Mutual Casualty Co. v. Wesbrooks,* 511 S.W.2d 406, 409 (Tex.Civ.App.—Amarillo 1974, no writ); Tex. R.Civ.Evid. 702. Appellees' contention that Dr. Katz was not qualified to give the opinions that he did because he is an anesthesiologist and not a hematologist is not well taken. It is sufficient that he is a medical doctor, as are the defendants.

### Reasonable Medical Probability

■ Next the appellees argue that Dr. Katz's testimony is no evidence because it is not based on the proper reasonable medical probability standard. It is undisputed that Dr. Katz testified that all of his opinions were based on reasonable medical probability. However, we agree with the appellees that an expert tracking the proper words of Texas cases does not close the inquiry. The substance of the testimony must also be examined. *Merrell Dow Pharmaceuticals, Inc. v. Havner,* —— S.W.2d —— (Tex.App.—Corpus Christi 1994, No. 13–92–540–CV, n.w.h.).

Appellees point to the fact that under cross-examination Dr. Katz was forced to concede that there were other possible causes of Mrs. Hernandez's death. However, Dr. Katz explained that while there are other possibilities of Mrs. Hernandez's death, the blood clot is a stronger probability than all of the possibilities put together. This is the same thing as saying it is more probable than not that the blood clot caused the death. Where there are several possible causes and there is evidence that one of those causes is a probable cause, the plaintiff is entitled to a jury issue as to the defendant's negligence. *Kieswetter v. Center Pavilion Hosp.*, 662 S.W.2d 24 (Tex.App.—Houston [1st Dist.] 1983, no writ). Therefore, we are of the opinion that Dr. Katz's testimony was based upon the proper reasonable medical probability standard, both technically and substantively.

### Basis for Expert's Opinion

■ Finally, appellees argue that Dr. Katz's opinion on proximate cause is not supported by any facts. Appellees contend that it is unknown whether Mrs. Hernandez died from a blood clot, much less that the blood clot was caused by the wire. Appellees point to the lack of an autopsy report that might have proved whether Mrs. Hernandez died from a blood clot or not. However, it ill-behooves the appellee doctors to complain of the lack of an autopsy finding when it was their dissimulation in never revealing that the wire had been left in Mrs. Hernandez's heart that undoubtedly had an impact on the family's decision not to request an autopsy. There was no reason known to the family why an autopsy should have been done.

■ The wire itself was also never scientifically examined to see if there was any discernable evidence of a blood clot having been present on, or near the wire. The reason for this non-examination was the deliberate destruction of the wire. The despoliation of evidence should not benefit the actor; the presumption is to the contrary. Simply put, a party cannot destroy evidence and then complain of lack of proof of the evidence destroyed.

■ The appellees are correct in their assertion that there must be some factual underpinnings to provide a foundation for an expert's reasonable medical probability findings. TEX.R.CIV.EVID 702–705; *Schaefer v. Texas Employers' Ins. Assoc.*, 612 S.W.2d 199, 202–205 (Tex.1980). However, expert testimony on the issue of causation may take a variety of forms. There may be some evidence of causation if the expert's testimony establishes general medical principles from which the jury may legitimately infer causation. *Emanuel v. Bacon*, 615 S.W.2d 847, 851 (Tex.Civ.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.). We have examined Dr. Katz's testimony and we hold that there is sufficient factual underpinnings supporting his expert opinion in this case in that: (1) Dr. Katz testified as a fact that a guide wire will cause the formation of blood clots; (2) He testified that the longer the wire was left in the heart, the greater the chance of a blood clot forming; (3) Dr. Katz testified that once a clot is formed that it will break loose eventually and get in the blood stream and in reasonable medical probability hit the lungs. Although the appellees successfully obtained admissions of other possible causes, Dr. Katz testified that the other possible causes taken together are less likely to have caused Mrs. Hernandez's death than a blood clot forming on the metal wire, breaking loose and entering her lungs. When this evidence is viewed in the light most favorable to the appellant and all reasonable inferences are indulged in their favor this testimony does raise a triable issue of fact on the appellees' negligence being the proximate cause of Mrs. Hernandez's death. *See Emanuel*, 615 S.W.2d at 851.

Appellees rely on *Schaefer v. Texas Employers' Ins. Assoc.*, 612 S.W.2d 199, 202–205 (Tex.1980). In *Schaefer*, the plaintiff, who worked in soil contaminated by bird droppings, suffered from atypical tuberculosis, which a jury found to be work-related. There are over thirty different subgroups of the bacteria that caused the plaintiff's illness, only two of which are carried by birds. Because the organism in the plaintiff's body was never serotyped, it was not known if the plaintiff had an avian or non-avian strain. The plaintiff's expert testified that he did not know whether fowl droppings had caused the

plaintiff's illness because he did not have any soil samples. The supreme court held that the expert's testimony amounted to no more than mere possibility, speculation and surmise.

The facts in *Schaefer* are distinguishable from this case. The plaintiff's expert testified that out of thirty different types of the bacteria only two were avian. The plaintiff's expert also testified that he did not know whether plaintiff had an avian or non-avian strain of the disease causing bacteria. *Id.* at 203. In contrast, here the plaintiff's expert testified that all other possible causes of Mrs. Hernandez's death combined are less than the probability that she died of a blood clot forming on the guide wire, breaking loose and travelling to her lungs. Also, the expert in *Schaefer* was criticized for not having tested the soil samples where the plaintiff worked. This was something that the expert could have done. It was within his power to do so. However, in our case, the corresponding weakness would be that no autopsy was done showing the blood clot. However, the facts of this case suggest that no autopsy was done because of the appellees' failure to tell the Hernandez family about the guide wire and their duplicity in deceiving the family about the necessity for removing the guide wire. At the time Mrs. Hernandez died the family knew nothing about the guide wire and thus had no reason to ask for an autopsy. In *Schaefer*, the defendants' did not actively seek to cover-up their negligence and the plaintiffs were only able to show a two in thirty chance that the plaintiff's injury was work related.

Based upon the foregoing, we feel that there was sufficient evidence entitling the plaintiffs to a jury issue as to the defendants' negligence and proximate cause. We recognize that the appellees have evidence supporting their position, including, but not limited to their belief that an elderly person that has already had a heart attack could well have another that would cause her death. With five defendant medical doctors and their various experts, a jury will, no doubt, be given the benefit of these opinions. Whatever weaknesses that may exist in Dr. Katz's testimony will be spotlighted. But

these are factual matters going to winning the hearts and minds of the jurors. We cannot agree that Defendants are entitled to a verdict as a matter of law. We sustain appellant's sole point of error and hold that a directed verdict was improper.

The judgment is reversed and remanded for trial.