heading for memo 




No. 04-99-00359-CV

Billie Odell STONE, Individually and as Personal Representative


of the Estate of Laquetta Mae Stone,

Appellant



v.



TEXAS HOME MANAGEMENT, INC.,


Appellee



From the 166th Judicial District Court, Bexar County, Texas


Trial Court No. 97-CI-03903


Honorable John J. Specia, Jr., Judge Presiding



Opinion by: Paul W. Green, Justice


Sitting: Tom Rickhoff, Justice

 Alma L. López, Justice

 Paul W. Green, Justice


Delivered and Filed: November 22, 2000 


AFFIRMED


 Appellant Billie Odell Stone (Stone) appeals from summary judgment granted in favor
of Texas Home Management, Inc. (THM). Stone alleges THM committed numerous acts of
negligence that proximately caused the death of Laquetta Mae Stone, Stone's sister and
adopted daughter. Stone brought suit against THM seeking damages for wrongful death,
mental anguish, and pain and suffering, under the Texas Wrongful Death Act, Tex. Civ.
Prac. & Rem. Code Ann. § 17.001, et seq. and the Texas Survival Act, Tex. Civ. Prac. &
Rem. Code Ann. § 71.02. In seven points of error, Stone asserts (1) the summary judgment
evidence raises a question of fact on the issue of proximate cause and (2) the summary
judgment motion failed to address issues of negligence pled separately from the wrongful
death and survival claims. Because we hold Stone failed to raise a genuine issue of material
fact as to the proximate cause of Laquetta's death, we affirm the trial court's judgment.

Background

 Laquetta Mae Stone was a mildly retarded adult who lived at the Guilford Forge
Group Home (Guilford), owned and operated by THM. Stone was Laquetta's brother, and
he also legally adopted her; however, Laquetta was her own legal guardian. The staff from
THM described her as "very high functioning," meaning she needed little supervision and
was encouraged to make most of her own decisions. She was expected to leave the group
home and return to her family in June or July of 1996.

 Laquetta worked in janitorial service at the Transportation Department from mid-afternoon to about 8 p.m. On June 3, 1996, she complained of nausea and vomiting at work,
but it was two or three hours before someone came to pick her up. The staff at Guilford gave
her Maalox and she felt better. The next morning, she got up early as usual, ate, dressed, and
went to another facility, Westbriar, to spend the day as she normally did before going to
work. Later in the day, after she arrived at work, she became ill again, this time complaining
of shortness of breath and pain in her chest. Brenda Henne, one of the staff of THM, picked
her up and took her to the emergency room. Brenda took a list of Laquetta's current
medications with her to the emergency room.

 Laquetta was examined by Dr. Carl Salinas. His chart notes her complaint of nausea
and vomiting the day before, as well as her complaints of shortness of breath and chest pain.
Brenda overheard Laquetta tell Dr. Salinas she had a problem with bronchitis and sinus. Dr.
Salinas noted Laquetta was being treated with drugs for asthma and sinus drainage and she
was taking birth control pills. His examination revealed rapid breathing, an elevated heart
rate, and lack of oxygen in the blood. Dr. Salinas diagnosed Laquetta with bronchitis. She
responded well to treatment of an anti-inflammatory injection for the chest pain and an
inhaler for her difficulty breathing. Dr. Salinas did not feel she needed to be admitted and
released her after about two hours. Laquetta returned to Guilford, ate dinner, and used her
inhaler under Brenda's supervision.

 The following morning, June 5, 1996, Laquetta got up as usual, took her medicine,
felt fine, and got on the bus to go to Westbriar. She suffered what appeared to be a seizure
and was rushed to Northeast Methodist Hospital. According to the medical examiner, Dr. Jan
Garavaglia, Laquetta suffered a massive bilateral pulmonary emboli, large blood clots in both
lungs, and probably would have been past saving by the time she got to the hospital. Dr.
Garavaglia explained the clots would have broken off from some other site in the body,
commonly the legs, and traveled to the lungs where they blocked the blood vessels. This
would have occurred just moments before Laquetta collapsed.

 In his petition, Stone alleges fourteen acts of negligence by THM that contributed to
cause Laquetta's death. These fourteen acts can be grouped as follows: 

(1) failing to timely obtain adequate medical evaluation and treatment on June 3rd and June
4th, and failure to monitor Laquetta the night prior to her death;

(2) failing to maintain adequate medical records and provide those records to Dr. Salinas;

(3) failing to provide proper staffing so that Laquetta did not have to get up early and go to
Westbriar during the day;

(4) failing to properly hire competent staff;

(5) failing to inform Stone of Laquetta's illness;

(6) failing to comply with Department of Human Services rules and regulations; and 

(7) failing to properly maintain and manage Laquetta's records and trust account.

Standard and Scope of Review

 We review a summary judgment de novo. Valores Corporativos, S.A. de C.V. v.
McLane Co., 945 S.W.2d 160, 162 (Tex. App.-San Antonio 1997, writ denied). To prevail
on a traditional summary judgment, the movant must show there are no genuine issues of
material fact and the movant is entitled to judgment as a matter of law on a ground set forth
in the motion. Tex. R. Civ. P. 166a(c); Nixon v. Mr. Property Mgmt Co., 690 S.W.2d 546,
548-49 (Tex. 1985). When a defendant moves for summary judgment, it must negate at least
one element of the plaintiff's cause of action or conclusively establish an affirmative defense.
See Zale Corp. v. Rosenbaum, 520 S.W.2d 889, 891 (Tex. 1975).

 When a party moves for a no-evidence summary judgment under Tex. R. Civ. P.
166a(i), alleging the non-movant lacks any evidence to carry its burden of proof, the non-movant must produce some evidence that raises a fact issue on the challenged elements. Tex.
R. Civ. P. 166a(i) cmt.; Weiss v. Mechanical Associated Serv., Inc., 989 S.W.2d 120, 123
(Tex. App.-San Antonio 1999, pet. denied). A no-evidence summary judgment is properly
granted if "(a) there is a complete absence of proof of a vital fact; (b) the court is barred by
rules of law or evidence from giving weight to the only proof offered to prove a vital fact;
(c) the proof offered to prove a vital fact is no more than a mere scintilla; or (d) the proof
conclusively establishes the opposite of the vital fact." Blan v. Ali, 7 S.W.3d 741, 747 (Tex.
App.-Houston [14th Dist.] 1999, no pet.); see also Weiss, 989 S.W.2d at 124. We review the
evidence in the light most favorable to the non-movant while disregarding all contrary
evidence and inferences. Weiss, 989 S.W.2d at 124.

Discussion

 THM asserts there is no evidence of proximate cause to support Stone's contentions.
Proximate cause encompasses the two elements of cause-in-fact and foreseeability. Doe v.
Boys Clubs of Greater Dallas, Inc., 907 S.W.2d 472, 477 (Tex. 1995); Travis v. City of
Mesquite, 830 S.W.2d 94, 98 (Tex.1992). These elements cannot be established by mere
conjecture, guess, or speculation. Doe, 907 S.W.2d at 477; McClure v. Allied Stores of Tex.,
Inc., 608 S.W.2d 901, 903 (Tex.1980). The test for cause-in-fact is whether the negligent
"act or omission was a substantial factor in bringing about injury," without which the harm
would not have occurred. Doe, 907 S.W.2d at 477; Prudential Ins. Co. v. Jefferson Assoc.,
Inc., 896 S.W.2d 156, 161 (Tex. 1995). Although proximate cause is often a jury question,
it becomes a question of law when reasonable minds cannot differ on the conclusion to be
reached. Boyd v. Fuel Distribs., Inc.,795 S.W.2d 266, 272 (Tex. App.-Austin 1990, writ
denied).

 Because Stone alleges Laquetta died due to a lack of adequate medical care, he must
establish, by expert medical testimony based on a reasonable degree of medical probability,
that THM's negligence was a proximate cause of Laquetta's death. See Roarke v. Allen, 633
S.W.2d 804, 809 (Tex. 1982); Martin v. Durden, 965 S.W.2d 562, 567 (Tex. App.-Houston
[14th Dist.] 1997, writ denied); see also Ponder v. Texarkana Mem'l Hosp., Inc., 840
S.W.2d 476, 478 (Tex. App.-Houston [14th Dist.] 1991, writ denied) (professor of
neuroscience at medical school possessing same degree of expertise as doctors allowed to
testify to causation). If the evidence shows that none of THM's acts or omissions
proximately caused Laquetta's death, summary judgment is proper. See Hernandez v. Calle,
963 S.W.2d 918, 921 (Tex. App.-San Antonio 1998, no pet.). 

 1. Stone's evidence

 (a) The medical experts

 In an effort to raise an issue of fact on the element of causation, Stone presented
affidavits from two nurses and four doctors. Two of the physicians, Dr. Howard Eisenberg
and the medical examiner, Dr. Garavaglia, do not address the alleged negligence of THM.
The nurses' affidavits are conclusory. Both nurses outline numerous alleged negligent acts
by THM, but neither witness explains how that conduct contributed to cause Laquetta's
death. Conclusory affidavits are insufficient to raise an issue of fact on the element of
proximate cause. See Blan, 7 S.W.3d at 748; Jones v. Miller, 966 S.W.2d 851, 854 (Tex.
App.-Houston [1st Dist.] 1998, no pet.).

 The testimony of Dr. Salinas, who treated Laquetta in the emergency room, does not
support an inference that THM's conduct contributed to cause Laquetta's death. Dr. Salinas
testified Laquetta improved with treatment and her symptoms normalized, so he saw no need
to keep her overnight. The admission of a patient to the hospital is a decision he makes, not
the patient. He also testified patients do not normally bring medical records to the emergency
room. Dr. Salinas testified he missed the diagnosis. He did not identify any information he
did or did not receive from THM that would have influenced or changed his diagnosis.

 Dr. Gary Wright, Stone's primary expert witness, furnished two affidavits as well as
deposition testimony. In his first affidavit, Dr. Wright summarized Laquetta's treatment and
discussed some of the characteristic symptoms and risk factors for pulmonary embolism. He
noted she had certain very significant symptoms, including shortness of breath, pleuritic
chest pain, rapid breathing, rapid heart rate and lack of oxygen in the blood. (emphasis in the
original). He felt Dr. Salinas made a typical misdiagnosis and the standard of emergency care
had not been met. In his second affidavit, Dr. Wright concluded the failure to provide a
complete medical history to the emergency room doctor was a proximate cause of Laquetta's
death, however, he did not specify what information was missing or incorrect. (1) He also
acknowledged that patients do not and should not bring their complete records to the
emergency room.

 "A legal conclusion in an affidavit is insufficient to raise an issue of fact in response
to a motion for summary judgment or to establish the existence of a fact in support of a
motion for summary judgment." Mercer v. Daoran Corp., 676 S.W.2d 580, 583 (Tex. 1984)
(emphasis added). Dr. Wright's affidavits do not provide any summary judgment evidence
on the issue of causation as it relates to THM. He makes conclusory statements about
missing records but does not say what was lacking or what might have been inaccurate. He
does not detail how a lack of records caused a misdiagnosis or explain what information in
the records would have led to a correct diagnosis. Therefore, both affidavits are conclusory
and insufficient to create a fact issue on the element of causation. 

 In his deposition testimony given after the affidavits were produced, Dr. Wright states
the following opinion, "If the medical records from [THM] had been given to Dr. Salinas,
there is a --there's a chance that he would have been able to make an appropriate diagnosis
and to be able to save Ms. Stone's life by administering the appropriate treatment." However,
Dr. Wright was not able to identify any specific medical information THM should have
provided to Dr. Salinas that would have significantly aided Dr. Salinas in making a diagnosis
of pulmonary embolism. (2)
 Dr. Wright's opinion is no more than "mere possibility,
speculation, and surmise and could not be evidence of causation." Weiss, 989 S.W.2d at 125-26 (citing Schaefer v. Tex. Employers' Ins. Ass'n, 612 S.W.2d 199, 204 (Tex. 1980)). More importantly, Dr. Wright's testimony conclusively established that Dr. Salinas
had all the medical information necessary to suspect a diagnosis of pulmonary embolism. Dr.
Wright identified the two primary risk factors for pulmonary embolism as obesity and birth
control and admitted Dr. Salinas knew both these factors were present in Laquetta. Dr.
Wright then identified the shortness of breath and chest pain, Laquetta's complaints, as two
very significant symptoms of pulmonary embolism. Dr. Wright testified, several times, that
those two symptoms, combined with the rapid breathing, rapid heart rate and low oxygen
saturation noted by Dr. Salinas, were the primary indicators to suspect pulmonary embolism.
Dr. Wright testified Dr. Salinas should have checked Laquetta for pulmonary embolism
without any other information. He stated, several times, Dr. Salinas had all the information
he needed to suspect pulmonary embolism. With this testimony from the only plaintiff's
expert to directly address the issue of causation, summary judgment was appropriate. (3)

 (b) THM staff and the state investigator 

 Stone presented testimony from several THM staff members and from Belinda
Watson, the Texas Department of Human Services investigator. This testimony was intended
to raise issues of fact regarding the lack of staff during the day, (4) THM's violations of the
Department's regulations, mishandling of Laquetta's trust account, and the loss of Laquetta's
medical records.

 Not one of the medical experts testified that failure of supervision during the day or
any of the alleged rules violations contributed to cause Laquetta's death. Not one of the
medical experts testified failure to take Laquetta to the hospital on June 3 for her nausea and
vomiting was a cause of her death. Nor did any of the experts suggest the staff could have
been alerted to a potential problem if they had supervised Laquetta more closely the night
before her death. The evidence only shows Laquetta felt better after treatment at the
emergency room and felt fine the morning of her death. Clearly, the trust account had
nothing to do with her death. Nothing in the record evidence suggests that Laquetta's medical
records were not available at the time of her death. (5) The testimony of the THM staff and
Brenda Watson does not raise an issue of material fact on the element of causation.

 (c) Billie Stone's testimony

 Finally, Stone testified that he should have been notified of Laquetta's illness. He says
if he had known of her condition, he would have "taken her to the hospital and acquired for
her care which would have resulted in saving her life." This testimony is obviously
conclusory, as well as speculative. Dr. Salinas and Dr. Wright testified the physician makes
the decision to admit a patient to the hospital. Given Dr. Salinas's testimony that Laquetta
responded well to his treatment, there is no reason to infer that Stone would have insisted
Laquetta be admitted or that Dr. Salinas would have admitted her.

2. THM's evidence

 Because Stone failed to offer any competent summary judgment evidence that raised
an issue of fact on the element of proximate cause, we need not examine THM's proffered
evidence. However, we note THM's expert, Dr. Michael Wooley, concurred with Dr. Wright
on the risk factors and significant symptoms of pulmonary embolism. Dr. Wooley concluded,
as did Dr. Wright, that Dr. Salinas had all the information necessary to suggest a diagnosis
of pulmonary embolism. There is no evidence in the record to suggest that THM's acts or
omissions proximately caused Laquetta Stone's death. We overrule Stone's first six issues.

3. Additional allegations of negligence

 In his last point of error, Stone claims the trial court erred in dismissing the entire case
because there were allegations of negligence separate from the wrongful death and survival
claims. Stone's brief does not specify what allegations are separate from the wrongful death
and survival claims, therefore, we can only speculate that he is referring to the alleged
violation of regulations and mishandling of the trust account. However, a careful reading of
the petition reveals these allegations are part of the list of allegations that Stone claims
caused Laquetta's death. Stone did not seek any fiduciary damages or any damages based on
anything other than Laquetta's death. The trial court was correct to find the lack of proximate
cause negated all claims. We overrule Stone's seventh issue.

Conclusion


 Because Stone failed to raise a genuine issue of material fact as to each of his claims,
we affirm the judgment of the trial court.


 PAUL W. GREEN,

 JUSTICE

DO NOT PUBLISH




1. Dr. Wright mentioned that prior treatment by Laquetta's regular physician may have been in error, so it is
possible he was referring to that misinformation, rather than anything said or done by employees of THM.
2. Dr. Wright identified 3 entries in the records that he believed may have helped Dr. Salinas with a diagnosis;
(1) Laquetta was on birth control, (2) she had complained at some unspecified time of pain in her left calf, and (3) she
had been treated in the past primarily for allergic rhinitis, that is, her prior problems regarded her nose and sinus rather
than pulmonary, the lungs. However, during the course of the deposition, when he looked again at the ER record, Dr.
Wright admitted Dr. Salinas knew Laquetta was on birth control and would have known Laquetta was being treated
for allergy problems with her nose and sinus from the current medications Dr. Salinas noted on his chart. Further, her
medical records clearly revealed she had been treated for chronic bronchitis in the past. As to the pain in the calf, Dr.
Wright said only that most often, the emboli come from the legs and sometimes pain in the leg can be another symptom
of a potential problem. However, he does not say if Laquetta's doctor discovered the cause of the pain, when this
occurred or when it was resolved.

3. Stone argues that the inconsistencies between Dr. Wright's affidavits and his deposition testimony set up
a credibility issue that must be resolved by a jury. We disagree. Dr. Wright was questioned about the affidavits during
his deposition. He resolved any inconsistencies. That resolution, unfortunately, did not work to Stone's benefit.
4. Laquetta normally got up early, before 6:00a.m., and transferred to the Westbriar facility, where she spent
the day prior to going to work. Stone says this is because there was no staff at her home during the day. No one from
the staff stayed at Guilford at all times because the residents were not home during the day. If Laquetta had wanted
to stay home, a staff member would have been scheduled to stay with her. Laquetta preferred to go to Westbriar
because that facility housed residents who needed more constant supervision; therefore, it provided programs and
activities throughout the day.
5. There were two or three initial investigations shortly after Laquetta's death. All requested medical records
were provided to the investigator. In October, after Stone complained about the previous investigations, another
investigation was started by Watson. This time Watson requested the entire medical record. The staff at Laquetta's
home did not know where it was. The evidence reveals this is because after the first investigations were finished, Lisa
Tullbane packed the entire medical record and sent it to storage in THM's Austin office. Lisa was later transferred to
another position and the new staff was unaware of where the records had been stored. The evidence shows only that
the medical records were no longer at Laquetta's former home some four months after her death.