11th
Court of Appeals

                                                                  Eastland,
Texas

                                                                        Opinion

 

General Motors Corporation

Appellant

Vs.                   No.
11-01-00075-CV - Appeal from Tarrant County

Mel Anthony Harper, Individually and

as Personal Representative of the Estate

of Jerry W. Harper, deceased; Roy William 

Harper; and Wilma Louise Harper

 

Appellees

 

General
Motors Corporation (GM) appeals from a judgment, based on a jury verdict,
awarding appellees $16,506,764.23 in compensatory damages plus prejudgment
interest and $31,000,000 in punitive damages. 
In its first three issues, GM asserts that there was no evidence or, in
the alternative, factually insufficient evidence of defect and of causation and
that the trial court erred in admitting evidence of patents.  Because we find that there is no evidence of
defect or of causation, we reverse and render a take-nothing judgment for GM.

Background
Facts

On August
7, 1993, Jerry W. Harper was driving north in a 1990 full-sized GM pickup when
Linda V. Armstrong, driving south in a Ford Bronco II, crossed the center of
the road and hit Harper almost head on. 
The frontal collision fractured Harper=s neck and rendered him a quadriplegic.  Harper died in 1997.  The
jury found that Armstrong was 10 percent responsible for Harper=s injury and that GM was 90 percent
responsible for his injury.    








At the
time of the accident, Harper had a chronic condition called ankylosing
spondylitis (AS), a disease of the spine that affects about .1 percent of the
population and that had calcified and fused Harper=s vertebrae. 
Dr. Joseph Lawson Burton, appellees= causation expert, acknowledged that Harper=s spine was brittle and fragile; he agreed
with the other experts that an AS spine is more susceptible to trauma than a
normal spine and that even a minor trauma, such as falling out of a bed or
chair or stepping off a curb incorrectly, could fracture an AS spine.  Harper=s neck was in a permanently flexed forward position.  Dr. Stanley Cohen, Harper=s doctor since 1990, testified that, when
Harper placed his back against a wall, his head was 6 to 8 inches or about 30
degrees from the wall.  Dr. Burton
testified that Harper=s neck
could not flex forward or backward more than 15 degrees without breaking. 

Dr. Burton
described Harper=s injury from the collision as a
flexion/compression or Adiving@ injury Awhere the head is arrested by some object and the body keeps wanting to
go toward the head.@  There were only three pieces of physical
evidence to support his theory:  a
smudge on the pickup=s back
window found by appellees= design expert over a year after the accident, a cut at the vertex/apex
(top) of Harper=s head, and X rays of Harper=s injury. 
Dr. Burton opined that the smudge was likely left by the impact from
Harper=s head, that the cut on the apex of his head
was from his head=s
contact with the back window, and that the X ray showed anterior compression
and posterior distraction which is indicative of a flexion/compression
injury.   

Appellees= Theory of GM=s Defective Design

Appellees
argue on appeal that Harper=s injury would have been prevented by either a head restraint or
a less elastic seat belt; however, that was not their contention at trial.  Indeed, appellees= brief describes the accident:

Upon impact, [Harper=s] body shifted forward toward the steering
wheel and then, caught by a shoulder belt that expanded and snapped back like a
rubber band, rebounded violently toward the rear window of the truck, where his
buttocks lifted slightly from the seat, and his head stopped his body=s backward motion by slamming into the rear
window.

 

Counsel for appellees
represented to the trial court that GM=s restraint system was defective because of a lack of a head restraint and
because of the excessive restraint rebound:

Again,
[defense] counsel confuses our defect claim versus our causation claim.  Our defect claim is and always has been
that there was both excessive restraint rebound and lack of head restraint, and
those combined to create the defect. 
(Emphasis added) 

 








At the
conclusion of Dr. Burton=s direct testimony, appellees= trial counsel asked Dr. Burton if he had an opinion based on whether
Harper=s injury would have been prevented if GM had
installed a head restraint and a seat belt mechanism that Awould not have flung him back towards the
[back window].@  Dr.
Burton expressed his opinion as follows:

That if
those things occurred, that we decreased the rebound energy, and we capture his
head and neck with a headrest, that he would not be a quadriplegic, and he
would have not died from complications of the quadriplegia. 

 

Appellees= case on defective design was premised upon
the combination of an overly elastic seat belt and the lack of a head
restraint.[1]  The legal sufficiency of the evidence will
be measured against that combination as described by appellees= causation and design experts as the basis
for their opinions.

Standard
of Review for Legal Sufficiency

In reviewing
the legal sufficiency of the evidence, an appellate court must consider all the
evidence in the light most favorable to the prevailing party and must indulge
every reasonable inference in favor of the prevailing party.  Associated Indemnity Corporation v. CAT
Contracting, Inc., GTS, 964 S.W.2d 276, 285-86 (Tex.1998); Merrell Dow
Pharmaceuticals, Inc. v. Havner, 953 S.W.2d 706, 711 (Tex.1997).  An appellate court will sustain a
no-evidence point of error when (1) the record discloses a complete absence of
evidence of a vital fact; (2) the court is barred by rules of law or of
evidence from giving weight to the only evidence offered to prove a vital fact;
(3) the only evidence offered to prove a vital fact is no more than a mere
scintilla; or (4) the evidence establishes conclusively the opposite of the
vital fact.  Uniroyal Goodrich Tire
Company v. Martinez, 977 S.W.2d 328, 334 (Tex.1998).  Any evidence supporting the jury=s finding that is of probative value and that is more than a scintilla
is legally sufficient to uphold the finding. 
Leitch v. Hornsby, 935 S.W.2d 114, 118 (Tex.1996); Burroughs Wellcome
Company v. Crye, 907 S.W.2d 497, 499 (Tex.1995).  More than a scintilla of evidence exists where the evidence
supporting the finding, as a whole, rises to a level that would enable
reasonable and fair-minded people to differ in their conclusions.  Transportation Insurance Company v. Moriel,
879 S.W.2d 10, 25 (Tex.1994).

 








                                                            Proving
a Design Defect

To
establish a design defect, a plaintiff must prove (1) that the design renders
the product unreasonably dangerous as designed, taking into consideration the
utility of the product and the risk involved in its use, and (2) that a safer
alternative design exists which would substantially reduce the risk of injury
and be economically and technologically feasible. General Motors Corporation v.
Sanchez, 997 S.W.2d 584, 588 
(Tex.1999).[2]

The
principal utility of a vehicle=s restraint system is to reduce the driver=s or passenger=s movement after a crash to prevent or lessen injuries from a second
collision of that person with something inside the vehicle.  Many factors, such as forces upon the body
and how to dissipate energy from a crash, must be taken into account in
designing a restraint system.  Experts
on both sides agreed that the proper design philosophy is to Aprotect the largest group of people.@  They
further agreed that for drivers a head or chest impact with the steering wheel
is the principal risk in frontal collisions. 









The
National Highway Traffic Safety Administration (NHTSA) conducts safety tests
and issues federal motor vehicle safety standards for the automobile
manufacturers.  Compliance with NHTSA
regulations provides a presumption of no design defect.  Sims v. Washex Machinery Corporation, 932
S.W.2d 559, 565 (Tex.App. B Houston [1st Dist.] 1995, no writ).

It was not
disputed that GM complied with NHTSA standards, that GM=s polyester belting was the industry
standard, and that the same belting system was the accepted system used by
manufacturers worldwide for pickups without airbags.  The design=s utility of preventing the driver from impacting the steering wheel
was demonstrated in this crash.  Dr.
Burton testified that the forces acting on Harper=s body as he went forward were 12 - 14 Gs and that the forces as he
went back would have been 3 - 4 Gs. 
Yet, it was undisputed that Harper was not injured by hitting the
steering wheel, the principal risk in a frontal collision. It is clear from
this accident that the design of GM=s belting prevented the driver from excessive forward movement; thus,
the principal risk was clearly outweighed by the utility of the design in
preventing that risk.

Appellees
contend, however, that there was another risk -- the likelihood and gravity of
harm from rebound caused by GM=s belting -- and that GM should have utilized appellees= proposed alternative webbing or some type of
energy absorbing device.[3]  However, appellees offered no evidence to
demonstrate that their alternative webbing or other energy absorbing ideas were
as safe as GM=s webbing in terms of protecting the greatest
number of drivers from the greatest risk, that of the driver impacting the
steering wheel.  That appellees= alternative design might have avoided Harper=s flexion/compression injury does not prove
that GM=s belting was defective.  As the reporters for The Restatement (Third)
of Torts: Products Liability state in their Comment b to Section 16:

The factors enumerated in ' 2, Comment f, for determining the
reasonableness of an alternative design and the reasonable safety of the
product are fully applicable to establishing defect in an increased-harm
case.  Furthermore, the alternative to
the product design must increase the overall safety of the product.  It is not sufficient that the alternative
design would have reduced or prevented the harm the plaintiff suffered if the
alternative would introduce into the product other dangers of equal or greater
magnitude. 

 








 Steven Richard Syson testified as appellees= design expert at trial.  A substantial portion of his testimony
involved patents that Syson downloaded from the internet.  Thus, we will first address GM=s second issue.

Admission
of Patents

GM asserts
in its second issue that five patents were erroneously admitted into evidence
over hearsay and relevancy objections. 
Appellees respond that the exhibits were self-authenticating, official
government publications which proved the existence of the patents and that they
were Arelevant to show the state of knowledge in
the automotive industry as early as 1968.@  The patents, which were issued
by the United States Patent Office between 1971 and 1975 for inventions
involving various energy-absorbing devices in vehicle restraint systems, were
relevant in this case.  TEX.R.EVID.
401.  








The
patents, however, contain various statements made by the persons procuring the
patents.[4]  Although the patents themselves were
admissible under the public records exception to the hearsay rule, TEX.R.EVID.
803(8), the statements within the non-GM patents constituted inadmissible
hearsay.  See TEX.R.EVID. 805.  One of the five patents admitted into
evidence was assigned to GM and, therefore, constitutes an admission of a party
opponent.  Church & Dwight Co., Inc.
v. Huey, 961 S.W.2d 560, 571 (Tex.App. - San Antonio 1997, pet=n den=d).  When part of a document
contains hearsay and part of it is admissible, the objection should point out
the statements claimed to be hearsay and specifically object to those
statements.  Brown & Root v. Haddad,
180 S.W.2d 339, 342 (Tex.1944).  GM,
however, made only a general hearsay objection to each patent and did not
specifically object to the hearsay contained within the patents.  A general objection to evidence as a whole,
which does not point out specifically the portion objected to, is properly
overruled if any part of that evidence is admissible.  Speier v. Webster College, 616 S.W.2d 617, 619 (Tex.1981); Brown
& Root v. Haddad, supra.  Even if
its objections had been specific, GM failed to request a limiting instruction.
TEX.R.EVID. 105(a).  Consequently, the
trial court did not abuse its discretion in admitting the patents into
evidence.  We overrule GM=s second issue.  

                                                      Evidentiary
Value of the Patents

Neither
the patents that were introduced into evidence nor the statements in the
patents support the jury=s findings as to defect or causation. 
First, these patents predated the switch from nylon to polyester
belts.  The rebound problem that was
noted in some of the non-GM patents related to the elasticity of nylon
belts.  It was undisputed that nylon
inherently has more stretch than polyester. 
The belt in Harper=s pickup was polyester.  Second,
nothing in the patents compared the safety of the patented inventions with the
restraint system used in Harper=s pickup.  Next, only one of
these patents, the Takata webbing, was discussed in much depth by appellees= experts. 
Syson testified that the Takata webbing was the alternate design that GM
should have used; it is discussed elsewhere in this opinion in more
detail.  Finally, Syson admitted that
the benefits claimed in the patents were not necessarily accurate, workable, or
manufacturable.  We hold that the
patents and the statements constituted no evidence of either a safer
alternative design or of causation.

Analysis
of Appellees=
Defect Claim








Appellees
did not provide any evidence of flexion/compression neck injuries resulting
from rebound in a frontal crash.  Much
of their evidence related to whiplash neck injuries from a rear impact, the
need for head restraints to prevent whiplash neck injuries in a rear impact,
the contention that rebound is a problem in frontal crashes, and the contention
that the GM belting causes Atoo much@ rebound. 
We will assume with appellees that rebound is a problem.  Our focus will be on whether appellees
proved that there was an alternative seat-belting design that would have been
safer overall than GM=s
belting design. 

Syson
claimed that the GM seat and shoulder belting was defective because it was too
elastic and because it had a shoulder belt that was too long.  As to the elasticity, Syson testified:

Well, the
seat belt fabric is springy, so it does have some elasticity, and that
elasticity is what stores the energy and causes the rebound movement or the
rearward movement of the occupant, even in a frontal crash.  (Emphasis added) 

 

He confirmed at another
point in his testimony that it is the elasticity or stretching of the GM
belting that is the defect.  Following
is the question by appellees= counsel and Syson=s answer:

Q. [The] elastic elongation being undesirable
because of the elastic rebound, is that the same thing we have been talking
about as restraint rebound?

 

A.  Yes, it is. 

 

Syson
relied principally on a Takata seat belt webbing referred to in a 1973 patent
as his Asafer@ alternative design.  He claimed
that it would reduce rebound without increasing the driver=s forward movement any more than GM=s webbing. 
That unsupported statement was contradicted by Syson=s own testimony concerning the physical
characteristics of the Takata webbing and those of GM=s webbing. 
He agreed that the Takata webbing absorbs energy by stretching or
elongating and that the Takata webbing stretches by 40 percent at 2,500 pounds
force versus 6 to 8 percent for the GM webbing.  Although he contended that the Takata webbing would meet the
Federal Motor Vehicle Safety Standard limit for stretching, Syson acknowledged
that Ait=s right at the outer limit of that.@  Syson did not dispute that,
although Takata is the largest seat belt manufacturer in the world today, no
vehicle manufacturer has ever used the Takata webbing discussed in the 1973
patent.








Syson
testified that the Takata webbing had been publicly tested and proven, but he
mentioned only two magazine articles and an unspecified test by the U. S. Navy
as the basis for his claim.  The first
test he referred to was described in a 1974 Society of Engineering
article.  The trial court ruled that the
article was inadmissible as hearsay but that Syson could refer to it as a
learned treatise. TEX.R.EVID. 803(13). 
Syson testified only that Ano one was injured@ during the test.  Apparently,
the test compared the Takata webbing to the standard nylon systems then in
use.  We note that the GM polyester
belting system was developed later. 
More in point, Syson conceded on cross-examination that the test did not
involve steering wheels and steering columns being in front of the vehicle=s occupant. 
That test constitutes no evidence that the Takata webbing would protect
a driver from the principal risk of impacting a steering wheel.

The only
other test referred to by Syson was one described in a 1980 article.[5]  This article also is not in evidence because
of its hearsay characteristics.  Syson
conceded that the article concluded that Calspan, a research firm that did the
tests, had recommended not using the Takata webbing because of the danger of
the driver impacting the steering wheel due to the 40 percent stretch of the
webbing.  Two GM experts testified that
the tests discussed in the magazine articles showed that too many drivers would
impact the steering wheel in frontal crashes. 
Edward R. McKenna, a GM expert, stated that the Takata webbing had never
been used in a passenger car or truck. 

Appellees
contend that Syson was also talking about the design of GM=s seat and shoulder belt and how it was installed.  Here is his testimony:

Q. [I]s there anything that happens that
would cause [a driver] to have [his] head go backwards against the window?

 

A.  Well, in this design of seat belt system,
yes.

 

Q.  Explain to us what that is?

 

A.  Well, the seat belt in this vehicle has a
very long shoulder belt, and that long shoulder belt stores up a lot of energy,
and throws the driver back after the crash. 

 








Syson then described the
routing loop, where the bolts are located, and the fact that GM has a two-spool
retractor and two separate belts.  He
made no effort to say why this was a bad design other than his statement that Athis vehicle has a very long shoulder belt.@  The
only other statement by Syson concerning GM=s design was:

I didn=t say the specification was wrong. 
I said that the belt, the way it=s designed and installed in the vehicle, gives you too much rebound
velocity.  The specification for the
[polyester] webbing, I have no complaints about that.[6]


 

McKenna
testified that GM=s
system has emergency locking retractors that lock the seat belt and the
shoulder belt automatically just before the occupant moves after a crash.  Appellees did not dispute GM=s evidence that Harper=s restraint system worked as designed.  Thus, any forward movement would only be due
to stretch in the belting; it is not clear what Syson meant by the shoulder
belt being Avery long@ or how it caused Atoo much@ rebound velocity.  Syson did not elaborate on how the GM belting was defectively
designed or how it should have been designed differently.  Unsupported statements that an alternative
design would be safer is no evidence. 
General Motors Corporation v. Sanchez, supra at 591; see Schaefer v.
Texas Employers= Insurance Association, 612 S.W.2d 199, 202
(Tex.1980)(no evidence on causation despite Amagic words@ where
testimony relied on possibility and surmise). 

Syson=s testimony on a safer alternative may be
summarized and analyzed as follows:

(1) GM
should have used the Takata webbing. 
But there is no evidence that it would have protected drivers from the
greatest risk B that of impacting the steering wheel.  To the contrary, it was undisputed that the
Takata webbing has much greater stretch than GM=s, that the Calspan research firm had rejected it for drivers, and that
no manufacturer had ever used it in the production of vehicles.

(2) GM=s shoulder strap was too long and caused
rebound.  But Syson did not say how it
should be redesigned.








(3) Some
type of energy absorbing device should have been used.  But Syson provided no evidence of an energy
absorbing device (other than the Takata webbing) except to refer to some of the
items described in the patents.  He
admitted that benefits claimed in patents were not necessarily accurate, workable,
or manufacturable.  He did not demonstrate
how any of the items would have prevented Harper=s injury nor had he tested any of them.  The record reflects that there were independent companies that
did crash testing, and there appeared to be no reason why Syson could not have
tested his alternative ideas.  Syson=s testimony relied on possibility and
surmise.

Appellees
argue that energy absorbing devices are widely used in cars today, but Syson
admitted that this was not really the case until the advent of airbags to
prevent the driver from impacting the steering wheel.  Also, the energy absorbing devices described in the patents were
primarily designed to solve the elasticity problem of nylon belting.  The GM belting was polyester.

GM did not
object to Syson=s testimony nor was it necessary to do so
under our reading of  General Motors
Corporation v. Sanchez, supra, and Maritime Overseas Corporation v. Ellis, 971
S.W.2d 402 (Tex.), cert. den=d, 525 U.S. 1017 (1998).  GM=s no-evidence point is that appellees
provided no evidence of a safer design and that the undisputed evidence was
that the Takata webbing was more dangerous for drivers.  GM is not contending that Syson=s testimony constituted no evidence because
it was based on unreliable, scientific methodology.  

In
Maritime Overseas Corporation v. Ellis, supra at 409, the Texas Supreme Court
held that a complaining party must object to the reliability of scientific
evidence before trial or when the evidence is offered; otherwise, the
complaint is waived.  The court cited
Merrell Dow Pharmaceuticals, Inc. v. Havner, supra at 713, and E. I. du Pont de
Nemours and Company, Inc. v. Robinson, 923 S.W.2d 549, 557 (Tex.1995), for its
holding.  The court discussed the
special nature of scientific expert testimony and the trial court=s responsibility for making the preliminary
determination of whether the proffered testimony meets the standards for
scientific reliability.  Maritime
Overseas, like Robinson and Havner, involved a scientific
theory on causation.  The issue in Maritime
Overseas was whether exposure to Diazinon can cause long-term
neurotoxicity.  Because scientific
testimony is unique and is often strongly contested, especially on causation
issues, the court reasoned:

Without requiring a timely objection to the
reliability of the scientific evidence, the offering party is not given an
opportunity to cure any defect that may exist, and will be subject to trial and
appeal by ambush.

 

Maritime Overseas
Corporation v. Ellis, supra at 409.








Because of
Maritime Overseas= unusual procedural history, it is not clear how broadly the court will
apply its waiver rule. See Judge Harvey Brown, Procedural Issues Under
Daubert, 36  HOUS. L. REV. 1133,
1160-68 (1999).  We believe that the Maritime
Overseas= waiver rule is limited to the question of
whether the basis for the expert=s opinion depends on a reliable scientific methodology.

The Texas
Supreme Court in General Motors Corporation v. Sanchez, supra, indicated that a
challenge to the reliability of scientific evidence after trial comes
too late.  General Motors Corporation v.
Sanchez, supra at 590.  Although the
court said that GM=s
arguments went to the reliability and admissibility of the plaintiff=s expert evidence, the court detailed the
expert=s evidence and found it to be legally
sufficient.  Scientific methodology was
not at issue in Sanchez, only an engineering design.  Significantly, the Supreme Court
distinguished Burroughs Wellcome Company v. Crye, supra, and Schaefer v. Texas
Employers= Insurance Association, supra.  The Sanchez court observed that the
expert=s opinion in Schaefer Awas founded upon mere possibility,
speculation, and surmise@ and that the expert=s opinion in Burroughs Wellcome was Awithout probative value and cannot support a
verdict or judgment@
because Athe only facts in evidence contradict the
assumption of the expert upon which his opinion is based.@ 
Thus, the distinction between admissibility and legal sufficiency will
still be observed, except that a legal sufficiency claim can be waived to the
extent that the claim questions the reliability of the science and its
methodology.








Both this
court and the Texas Supreme Court in Schaefer were careful to note that
the scientific theory was not under attack. Texas Employers= Insurance Association v. Schaefer, 598
S.W.2d 924 (Tex.Civ.App. B Eastland), aff=d, Schaefer v. Texas
Employers= Insurance Association, 612 S.W.2d 199
(Tex.1980).  It was agreed that the
plaintiff=s disease was caused by mycobacteria
intracellularis bacteria, some serotypes of which are pathogenic to birds.  The expert testified that the plaintiff
contracted the disease by working as a plumber in soil contaminated with bird
feces.  What was missing was any
evidence that the bacteria was in any soil where he worked.  Schaefer v. Texas Employers= Insurance Association, 612 S.W.2d at
202.  Also, the expert admitted that no
serotyping tests had been done to determine whether the plaintiff had an avian
strain, for which birds are the pathogen, or a non-avian strain of the
disease.  In our case, Syson did no
testing to determine whether his suggested alternative Takata webbing or any
other suggestion was safer in terms of preventing the driver from hitting the
steering wheel and would be safer overall.

The expert
in Burroughs Wellcome based his opinion that the Polysporin TM spray
caused a frostbite injury on his assumption that the plaintiff=s foot turned white immediately upon
application of the spray.  He further
stated that, if the plaintiff=s foot was red after the spray was applied, then his diagnosis would
have been different.  The plaintiff in a
deposition and her husband at trial testified that the plaintiff=s foot turned red after the spray was
applied.  Burroughs Wellcome 

Company v. Crye, supra at
499.  Finding that there was no evidence
on causation, the Supreme Court stated:

When an expert=s opinion is based on assumed facts that vary materially from the
actual, undisputed facts, the opinion is without probative value and cannot
support a verdict or judgment.  See
Schaefer v. Texas Employers= Ins. Ass=n, 612
S.W.2d 199, 202-05 (Tex.1980).

 

Burroughs Wellcome
Company v. Crye, supra at 499.

The
scientific principles involved in Syson=s testimony were not challenged. 
GM acknowledged that Takata webbing does absorb energy because of its
weave and its stretching.  The problem
is that Syson did not demonstrate that the Takata webbing was safer than the GM
belting.  Syson did no test to see if
Takata webbing or other energy absorbers would prevent drivers from hitting the
steering wheel.[7]   The undisputed testimony of two GM experts
and of Syson concerning the Calspan article was that Takata webbing should not
be used as part of a restraint system for drivers.  Syson=s
opinion that the Takata webbing was safer was based on an assumption that was
rebutted by the evidence.  Burroughs
Wellcome Company v. Crye, supra.

We sustain
GM=s first issue without reaching the factual
sufficiency claim.

Proving
Causation








In the
third issue, GM challenges the legal and factual sufficiency of the evidence on
the issue of causation.  To establish
liability for a design defect, a plaintiff must prove that the defect was a
producing cause of his injury.  A
producing cause is "an efficient, exciting, or contributing cause, which
in a natural sequence, produced injuries or damages complained of, if
any."  Union Pump Company v.
Allbritton, 898 S.W.2d 773, 775 (Tex.1995); Rourke v. Garza, 530 S.W.2d 794,
801 (Tex.1975).  Included within
producing cause is cause in fact, which means that the defendant's conduct must
have been a substantial factor in bringing about the injury and that the injury
would not have occurred but for the defendant=s conduct.  Union Pump Company
v. Allbritton, supra; General Motors Corporation v. Saenz, 873 S.W.2d 353, 357
(Tex.1993).  Therefore, appellees must
have proved that the defect in the restraint system was a cause of Harper=s injuries. 
See RESTATEMENT (THIRD) OF TORTS '' 1, 15, & 16 (1998).  

                                                     Standards
for Scientific Evidence

We review
the legal sufficiency of the evidence under the well-recognized standard of
review previously set out in this opinion. 
In applying that standard of review, we are aware that Aan expert=s bald assurance of validity@ of the underlying technique or methodology in support of his testimony
is not enough to constitute some evidence. 
Merrell Dow Pharmaceuticals, Inc. v. Havner, supra at 712; E. I. du Pont
de Nemours and Company, Inc. v. Robinson, supra at 559.  There must be objective, independent
validation of the expert's methodology. 
Merrell Dow Pharmaceuticals, Inc. v. Havner, supra.  The Texas Supreme Court in Merrell Dow
and Robinson set forth some of the factors that courts should consider
in looking beyond the bare opinion of the expert.  Those factors include:

(1) the extent to which the theory has been or can be tested;

(2) the
extent to which the technique relies upon the subjective interpretation of the
expert;

 

(3) whether the theory has been subjected to peer review and
publication;

(4) the technique's potential rate of error;

(5)
whether the underlying theory or technique has been generally accepted as valid
by the relevant scientific community; 
and

 

(6) the non‑judicial uses that have been made of the theory or
technique.

Merrell Dow
Pharmaceuticals, Inc. v. Havner, supra at 714; E. I. du Pont de Nemours and
Company, Inc. v. Robinson, supra at 557. 
The court in Merrell Dow applied these factors to a no-evidence review
based on the unreliability of scientific evidence on the issue of
causation.  








                                                    Analysis
of Dr. Burton=s
Testimony

GM
challenged the admissibility and the reliability of Dr. Joseph Lawson Burton=s testimony by a Daubert/Robinson[8]
motion and hearing.  The trial court
denied GM=s motion and allowed Dr. Burton to testify
regarding the cause of Harper=s injuries.  Dr. Burton, a
forensic pathologist, testified that, based on reasonable medical probability,
Harper would not have suffered quadriplegia or death if his pickup had been
equipped with a head restraint to capture Harper=s head and a seat belt mechanism that decreased the rebound
energy.  Dr. Burton determined that
Harper=s condition was borderline, and he asserted
the following: 

So, if we decrease the force that=s caused this fracture to do that stretching,
then there is a reasonable probability that Mr. Harper is not a quadriplegic,
that he may not have a cord injury, at all, or certainly that he would have a
lesser degree of neurological deficit. 

 

In addition to Syson=s opinion on defect, Dr. Burton=s opinion was based upon Harper=s medical records, the smudge, results of
crash tests, and medical literature.  

From the X
rays found in Harper=s
medical records, Dr. Burton determined that, during the wreck, Harper suffered
a flexion/compression injury and fracture at the sixth cervical vertebra level,
resulting almost immediately in quadriplegia. 
A flexion/compression injury or Adiving injury@
occurs when a force is placed down the column of the neck while the head is
flexed forward.  Dr. Burton noted that,
in addition to the flexion/compression injury, the medical records indicated
that Harper had a laceration to the vertex/apex of his head, which Dr. Burton
defined at trial as the highest point of the head.  Dr. Burton opined that Harper hit the vertex of his head on the
back window, thereby causing the smudge and placing a compressive load on
Harper=s spine in such a way that Ait kind of collapsed the front of that
vertebra, allowed the back side of the vertebra to split [and] stretched the
cord.@ 








Although
there were many smudges on the back window, the smudge that appellees relied on
was located in a position Akind of behind@ where
Harper=s right ear would have been if he were
sitting in the driver=s
seat.  The smudge was made by something
oily, and it contained Aswipe marks.@  Dr. Burton testified that the smudge Aat least has the characteristics of a hair
swipe mark.@  He
also stated that he did not know when the smudge was made or if it was made by
Harper but that it was Alocated in a line where you would expect [Harper=s] head to at least reasonably go in that
direction as a result of the crash forces in this accident.@ 

In order
to illustrate Dr. Burton=s opinion of what he thought happened to Harper in the wreck, appellees
introduced a diagram containing computer-assisted drawings.  The diagram showed a man, presumably similar
to Harper, sitting in the driver=s seat of a pickup similar to Harper=s.  The man=s hips were rotated forward and his buttocks Aa hair@ forward.  Dr. Burton presumed
that Harper would sit in such a position in order to see down the road.  Shortly after impact, Harper=s pelvis Awants to start going forward.@  The forces acting on Harper as
he moved forward were about 12 to 14 Gs. 
Harper=s knees hit the dash, breaking his right
kneecap; and then his torso loaded the belt, Amaxing out the stretch@ on the belt.  Harper did not
hit the steering wheel but came very close. 
Dr. Burton believed that Harper moved forward a few inches, which would
put his buttocks Aabout
six inches@ from the seat back.  According to Dr. Burton, Harper then
rebounded back some and, with his head still flexed forward, hit the vertex of
his head on the back window at the location of the smudge.  Harper did not hit the window with enough force
to break the window.  The forces acting
on Harper as he rebounded were approximately 3 - 4 Gs.  The crash tests that were relied upon by Dr.
Burton involved greater force than that in Harper=s wreck.  Harper=s wreck admittedly involved about 44 percent
less energy than the crash tests.  According
to an article relied on by Dr. Burton, the type of injury sustained by Harper
can result from a head speed of no more than about ten feet per second, and Ain some cases@ the speed of an occupant=s head during rebound is enough to produce an injury. 








Dr. Burton
testified that he Abelieve[d]@ the injury mechanism that he described and
diagramed accounted for all of the available physical evidence.  He was Anot sure@ whether Harper=s body came up off the seat cushion during rebound or whether it would
have had to lift off of the seat in order to cause the injuries in this case
because there was no way to reproduce the accident and the forces acting on
Harper.  Dr. Burton did not confirm
through any study that Harper could have moved through the sequence shown in
the diagram or that Harper could have contacted the back window with the apex
of his head in the manner that Dr. Burton suggested. 

Because of
the fused condition of his spine and the permanently forward position of his
neck, in order for Harper to have hit the apex of his head on the back window
where the smudge was located, Harper=s body must have been somewhat perpendicular to the back window, and
the top of his head must have been parallel to the back window.  During trial, Dr. Burton admitted that, when
using an X ray of Harper=s fused spine to demonstrate how his head hit the back window, the X
ray would have to be turned 80 or 90 degrees. 
There was no evidence indicating that the restraint system in Harper=s pickup would have allowed Harper to hit the
window at such an angle.  

Using the
factors outlined in Merrell Dow and Robinson, we hold that Dr.
Burton=s testimony was scientifically unreliable
and, therefore, constituted no evidence of causation.  Dr. Burton did not and asserted that he could not test his theory
as to how Harper received the flexion/compression injury.  Dr. Burton also relied on subjective
interpretations, including when and how the smudge was made, where Harper was positioned
as he sat in his pickup, whether or not he came up off the seat during rebound,
whether or not he even needed to come up off the seat for the injury to occur,
and whether or not it was even possible for Harper to have hit the back window
at the angle suggested by Dr. Burton. 
Dr. Burton stated that rebound phenomenon is not a significant problem
in the real world, and appellees brought forth no scientific evidence of other
similarly caused injuries.  Although the
type of injury Harper suffered is generally accepted within the scientific
community, the theorized cause in this case is not generally accepted and has
not been subjected to peer review, publication, or testing.  

                                                          Other
Causation Evidence

Appellees= design expert, Syson, also touched on the
issue of causation, but he did not perform the occupant kinematics of Harper=s wreck and did not testify that the defect
caused Harper=s injury. 
Syson testified that the dummy=s head in the crash tests rebounded in a downward path and that there
were no crash tests where the dummy rebounded upwards.  Syson added, however, that he had seen
physical evidence of an upward rebound in real accidents, but he did not
elaborate or bring forward any such evidence. 
Nor did he cite to any publications in support of that assertion.  Furthermore, the record contains no evidence
that a flexion/compression injury such as Harper=s has ever occurred as a result of restraint rebound.  








We hold
that there was no evidence of probative force to support the jury=s finding on causation.  Consequently, we sustain GM=s third issue without reaching the factual
insufficiency claim. 

This
Court=s Ruling

The trial
court=s judgment is reversed, and we render a
take-nothing judgment in favor of GM.

 

TERRY
McCALL

JUSTICE

 

October 25, 2001                                                                    

Publish. 
See TEX.R.APP.P. 47.3(b).                           

Panel consists of: Arnot, C.J., and

Wright, J., and McCall, J.











[1]Appellees=
counsel likewise framed the question in terms of the combination when he asked
Steven Richard Syson, appellees= design expert,
for an expert opinion.





[2]TEX. CIV. PRAC. & REM. CODE ANN. ' 82.005 (Vernon 1997), which became effective on
September 1, 1993, provides:

 

(a)  In a
products liability action in which a claimant alleges a design defect, the
burden is on the claimant to prove by a preponderance of the evidence that:

 

(1) there was a safer alternative design; and

 

(2)  the defect
was a producing cause of the personal injury, property damage, or death for
which the claimant seeks recovery.

 

(b) In this section, Asafer alternative design@
means a product design other than the one actually used that in reasonable
probability:

 

(1) would have prevented or significantly reduced the
risk of the claimant=s personal injury, property damage, or death without
substantially impairing the product=s
utility; and 

 

(2) was economically and technologically feasible at the time the
product left the control of the manufacturer or seller by the application of
existing or reasonably achievable scientific knowledge.





[3]See David G. Owen, Toward a Proper Test for Design
Defectiveness: AMicro-Balancing@ Costs and Benefits, 75 TEX. L. REV. 1661, 1675 (1997).





[4]Some of the statements contained in the non-GM patents
and read to the jury are the following: 

 

Elastic elongation of a safety belt is not desirable
because the elastic rebound of the wearer after sudden elongation of the belt
may cause fracture of the cervical vertebrae.

 

After the passenger=s
forward velocity is terminated, the energy stored in many of the present
restraint systems may be elasticity returned causing the passenger to
rebound.  This may occur because the
restraint system elongates during the transfer of energy from the passenger to
the system in a manner generally similar to a linear spring.

 

Naturally, it would be desirable to reduce the peak
load to which the passenger is subjected as well as the rebound caused by such
restraint systems. 

 

The belt is usually elastic, and this can sometimes
result in the passenger being Awhipped@ back into his seat in the moments after an
impact.  Since the belts are applied to
the passenger=s torso, the head is subjected to a sudden jerk when
the passenger hits the seat and this jerk can, in extreme conditions, break the
neck of the passenger. 

 

[T]he restraining safety belt, particularly the
shoulder belt, elastically elongates, so that upon the occupant reaching his
forwardmost position he is sharply flung rearwardly by the contraction of the
elastically elongated belt and this reaction is a common cause of injury,
frequently very seriously, to the occupant, as for example, with a resulting
broken cervical vertabrae (sic).

 

None of the statements were relevant to the elasticity
of polyester belting. 





[5]Syson did briefly refer to a test of the Takata
webbing by the U. S. Navy; but, apparently, it was not related to testing for use
as belting for vehicle drivers. 





[6]On redirect, Syson mentioned that some diesel powered
GM pickups have energy management loops in the belt, but he did not test or
otherwise demonstrate how the loops would perform in a crash similar to Harper=s.





[7]There also was no evidence of Takata=s rebound properties, only Syson=s conclusory statement that the rebound would be less.





[8]Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S.
579 (1993); E. I. du Pont de Nemours and Company, Inc. v. Robinson, supra.